**MICHIGAN ROAD BUILDERS ASSOCIATION, INC., a Michigan corporation, et al., Plaintiffs,**

v.

**William G. MILLIKEN, as Governor of the State of Michigan, et al., Defendants.**

Civ. A. No. 81–72258.

United States District Court, E.D. Michigan, S.D.

Aug. 12, 1983.

John B. Weaver, Keefe A. Brooks, Margaret E. Greene, of Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for plaintiffs.

Michael A. Lockman, Jack Blumenkopf, Asst. Atty. Gen., Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

JULIAN ABELE COOK, Jr., District Judge.

Plaintiffs are (1) several non-profit associations whose members are, in general, construction firms, contractors and suppliers, who have done, or are doing business with the State of Michigan, and (2) various profit corporations who have had, or seek, contracts with the State of Michigan. Defendant, William G. Milliken, is the former Governor of the State of Michigan. Defendant, The Department of Management and Budget of the State of Michigan, is a unit within State Government whose responsibilities include the procurement of supplies and services for the State. Defendant, Gerald H. Miller, is the former chief administrative officer of the State Department of Management and Budget. Defendant, The Department of Treasury, is a State governmental unit whose jurisdiction includes the construction and maintenance of State-controlled highways, streets and passageways. Defendant, John P. Woodford, is the former chief administrative officer for The Department of Treasury. The individual Defendants held their respective positions during all times that are relevant to the issues which are presently pending before this Court.

Jurisdiction in this matter is based on the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 2000d, 42 U.S.C. § 2000e *et seq.* and arises under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

Plaintiffs filed this action, seeking declaratory and injunctive relief against the Defendants. In their Complaint, they allege that their constitutional and civil rights had been violated by the enactment and enforcement of P.A.1980, No. 428, M.C.L.A. § 450.771 *et seq.* [P.A. 428]. At the same time, Plaintiffs filed a Motion for Preliminary Injunction, in which they asked this Court to enjoin the State from enforcing P.A. 428.

Thereafter, the Defendants filed an Answer to the Complaint, asserting, in part, that P.A. 428 is consistent with the Constitution and laws of the United States. After a hearing on Plaintiffs' Motion for Preliminary Injunction, the Court issued an Order Denying Plaintiffs' Motion for Preliminary Injunction because of their failure to satisfy the minimum standards of *Mason County Medical Association v. Knebel,* 563 F.2d 256 (6th Cir.1977).

This matter is now before the Court on the Motions for Summary Judgment, which have been filed by the respective parties to this action.

The Michigan Legislature enacted P.A. 428, which became effective on January 13, 1981. This Act represented the culmination of approximately nine years of effort by the legislative and executive branches of the State Government to increase the participation of minority and woman owned businesses in the procurement of goods, services and construction by the State. Section 450.772(2) of P.A. 428 establishes a procurement policy which sets interim and

expenditure goals of each department for minority and woman owned business as follows:

(a) For minority owned business, the goal for 1980–81 shall be 150% of the actual expenditures for 1979–80, the goal for 1981–82 shall be 200% of the actual expenditures for 1980–81, the goal for 1982–83 shall be 200% of the actual expenditures for 1981–82, the goal for 1983–84 shall be 116% of the actual expenditures for 1982–83, and this level of effort at not less than 7% of expenditures shall be maintained thereafter.

(b) For woman owned business, the goal for 1980–81 shall be 150% of the actual expenditures for 1979–80, the goal for 1981–82 shall be 200% of the actual expenditures for 1980–81, the goal for 1982–83 shall be 200% of the actual expenditures for 1981–82, the goal for 1983–84 shall be 200% of the actual expenditures for 1982–83, the goal for 1984–85 shall be 140% of the expenditures for 1983–84, and this level of effort at not less than 5% of expenditures shall be maintained thereafter.

A minority is defined as "a person who is black, hispanic, oriental, eskimo, or an American Indian who is not less than ¼ quantum Indian blood as certified by the person's tribal association and verified by the Indian affairs commission," M.C.L.A. § 450.771(e). A minority owned business is one in which more than fifty percent of the voting shares or interest in the business is owned, controlled or operated by a defined minority and more than fifty percent of the net profit or loss of the business accrues to those shareholders, M.C.L.A. § 450.771(f). A woman owned business is similarly defined, see M.C.L.A. § 450.771(j). Awards can only be made to qualified minority and woman owned businesses. Thus, all minority and woman owned businesses, to whom contracts are awarded, must "comply with the same requirements expected of other bidders, including but not limited to, being adequately bonded," M.C.L.A. § 450.772(5).

Plaintiffs argue that P.A. 428 violates the Equal Protection Clause of the Fourteenth Amendment, as well as 42 U.S.C. §§ 1981 and 1983. Plaintiffs do not contend that they have been (1) subjected to discrimination in the award of any particular contract or (2) denied the opportunity to bid on any contract because of P.A. 428. Rather, they assert that the Act is unconstitutional on its face. In their view, P.A. 428 creates an unlawful "set aside" (based on impermissible classifications by race and sex) that cannot withstand constitutional scrutiny because (1) the State cannot demonstrate a compelling interest in establishing such classifications, and (2) even if the State can establish a compelling interest, the selected remedy is not properly tailored to accomplish that interest.

The Defendants contend that P.A. 428 is remedial legislation which is designed to remedy the present effects of past discrimination. They also assert that the Act does not create an unlawful "set aside" on the basis of race or sex because it (1) merely establishes goals and affirmative practices in the State's procurement policy and procedures, and (2) even if the Act is deemed to create a "set aside," it is a lawful affirmative action program that does not violate the Equal Protection Clause of the Fourteenth Amendment or 42 U.S.C. §§ 1981 and 1983.

Interestingly, each party relies upon *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1979), in support of their respective positions.

In *Fullilove*, the Supreme Court examined and evaluated a constitutional challenge to the Minority Business Enterprise provision of the Public Works Employment Act of 1977 [MBE], § 106(f)(2), 42 U.S.C. § 6701 *et seq.* In a plurality decision, the Court determined that the MBE was constitutional notwithstanding its mandate that "at least 10% of [any grant for local public works projects] shall be expended for minority businesses."

In its ruling, it is clear that the *Fullilove* Court adhered to its earlier stance that "racial classifications are not *per se* invalid under [the Equal Protection Clause of] the Fourteenth Amendment," *Fullilove*, at 517,

100 S.Ct. at 2794 (Marshall, J. concurring); *Regents of University of California v. Bakke,* 438 U.S. 265, 356, 98 S.Ct. 2733, 2781, 57 L.Ed.2d 750 (1978). Although the Court merely concluded that Congress had the power to implement the MBE under Section 5 of the Fourteenth Amendment and Art. 1, Section 8 of the Commerce Clause, it does not appear that the Supreme Court retreated from its earlier pronouncements that affirmative action programs are subject to "strict scrutiny," *Fullilove* 448 U.S. at 519, 100 S.Ct. at 2795 (Marshall, J., concurring). Moreover, in light of the Sixth Circuit's recent opinion in *Bratton et al. v. City of Detroit et al.,* 704 F.2d 878 (6th Cir.1983), this Court determines that the proper standard of review in the instant cause must be one of strict scrutiny.

Where the claim of racial discrimination is made by the white majority, strict scrutiny is more than a generic term. Its qualities are not immutable. Thus, in an affirmative action case (such as the one presented here) strict scrutiny must not be applied in a manner in which it is "strict in theory, but fatal in fact," *Regents of University of California v. Bakke,* 438 U.S. at 361–62, 98 S.Ct. at 2784; *Fullilove v. Klutznick,* 448 U.S. at 507, 100 S.Ct. at 2789 (Powell, J., concurring), 448 U.S. at 519, 100 S.Ct. at 2795 (Marshall, J., concurring).

"A different analysis must be made when the claimants are not members of a class historically subjected to discrimination. When claims are brought by members of a group formerly subjected to discrimination the case moves with the grain of the Constitution and rational policy. A suit which seeks to prevent public action designed to alleviate the effects of past discrimination moves against the grain. . . ." *Bratton* at 886, *citing Detroit Police Officers v. Young,* 608 F.2d at 671, 697 (6th Cir.1979). Thus, this Court must examine *Fullilove* and the appropriate cases of the Sixth Circuit to determine the precise meaning of strict scrutiny within the context of legislative enactments which are alleged to favor a minority class of citizens over the dominate majority.

In *Fullilove,* Powell, J. stated that a racial classification is constitutionally prohibited "unless it is a necessary means of advancing a compelling governmental interest," 448 U.S. *at* 496, 100 S.Ct. at 2783. Unlike the traditional analysis, which requires that the means chosen must be absolutely necessary, he concluded that "the means selected by Congress [or a body with authority to act] need only be equitable and reasonably necessary to redress" an identified discrimination, *at* 510, 100 S.Ct. at 2791.

Justice Marshall adhered to his earlier position in *Bakke,* stating that ". . . the proper inquiry is whether racial classifications designed to further remedial purposes serves important governmental objectives and are substantially related to achievement of those objectives," *Fullilove,* at 519, 100 S.Ct. at 2795.

In *Bratton, supra,* the Sixth Circuit held that the standard of inquiry for the voluntary affirmative action plans of a public employer is whether the chosen remedial measures are reasonable in light of the significant governmental interest "in ameliorating the disabling effects of identified discrimination," *at* 886. Although the decision was rendered in the context of public employment, the *Bratton* Court indicated that Justice Marshall's opinion in *Fullilove* "clearly affirms the analysis generally relied upon" in the Sixth Circuit's initial affirmative action opinion in *Detroit Police Officers Association v. Young,* 608 F.2d 671, and reaffirmed in *Bratton, at* 885.

This Court is persuaded that the opinions of Justices Powell and Marshall are so closely aligned to the rule of the Sixth Circuit that this Court should not, and indeed, cannot deviate from the law of this Circuit. Thus, this Court believes that the *Bratton* standard should be applied to the instant cause.

Having determined that the law of this Circuit requires that the State must demonstrate a significant interest in ameliorating the past effects of present discrimination rather than the "compelling interest" standard which has been advanced by the Plain-

tiffs, this Court must examine the record to assess the nature of the interest of the State in enacting P.A. 428. Plaintiffs assert that the Act embodies a preference solely on the basis of race and sex. They contend that the only purpose of this Act is to foster minority and woman owned businesses and, thus, it was not designed to remedy anything. Plaintiffs strongly argue that P.A. 428 was not designed to remedy the present effects of past discrimination because the findings by the State are inadequate to establish the existence of past discrimination in the multitude of areas which are covered by the Act. Moreover, they say that there have been no specific findings of unlawful discrimination against any of the preferred classes in P.A. 428.

In response, the Defendants say that the Act does not create set asides, preferences, or quotas but merely establishes "goals" and "levels of effort" which would afford a greater opportunity for minorities and women to participate in State procurement activities. Notwithstanding, they contend that even if these goals are construed to be set asides or preferences, its finding of past impairment upon, and historical discrimination against, the classes, who are identified in P.A. 428, are sufficient to justify the use of racial and ethnic criteria by the Legislature as a means of remedying the present effects of past discrimination.

This Court has been called upon to determine whether P.A. 428, as written, comports with the Equal Protection requirements of the Constitution. This Court declines to designate P.A. 428 as a "goal" or "set aside" legislation. However, it is clear that the Act does provide a procurement mechanism which must be viewed as giving deference, if not preference, to minorities and women. Thus, this Court will examine P.A. 428 in the most stringent light, and will consider it as a "set aside" enactment for the singular purpose of evaluating these Motions for Summary Judgment.

In *Fullilove,* Justice Powell articulated two requirements for the establishment of "permissible remedial action." "First, the governmental body that attempts to impose a race-conscious remedy must have the authority to act in response to identified discrimination (citations omitted). Second, the governmental body must make findings that demonstrate the existence of illegal discrimination," 448 U.S. *at* 498, 100 S.Ct. at 2784.

Plaintiffs do not argue that the Michigan Legislature is an inappropriate authority to enact the race and sex conscious remedy which is embodied in P.A. 428. However, they do assert that the findings of the Legislature are inadequate to justify such a remedy. The degree of findings which are necessary to support a race or sex conscious remedy depends upon the body establishing such a remedy, see *Fullilove v. Klutznick, supra; Regents of University of California v. Bakke, supra.*

Here, Plaintiffs contend that the Defendants failed to make specific findings of past discrimination. In support of its position, they rely upon *Central Alabama Paving, Inc. v. James,* 499 F.Supp. 629 (M.D.Ala. 1980).

This Court notes that in *Central Alabama Paving,* the findings were made by an administrative body. The Supreme Court has never required the same degree of specificity for a legislative determination of past racial discrimination as that required for an administrative body or the judiciary branch of government. As Justice Powell noted in *Fullilove* "[t]he degree of specificity required in findings of discrimination and the breadth of discretion in the choice of remedies may vary with the nature and authority of a governmental body," *note* 14 *at* 515–16, 100 S.Ct. at 2794.

In *Fullilove,* the Petitioner contended that the legislative record must be treated "as the complete record of congressional decision-making" underlying its enactment of the MBE. Justice Powell indicated that such a requirement would be an unwarranted constraint upon the legislative process. Congress need not make "specific factual findings with respect to each legislative action," *at* 503, 100 S.Ct. at 2787. "Rather, [the Court] may examine the total contemporary record of congressional action deal-

ing with the problems of racial discrimination against minority business enterprises," *id.*

In *Bratton,* the Sixth Circuit reaffirmed the position articulated in *Young* and enumerated the type of evidence which is "necessary to justify a finding of prior overt discrimination," stating:

> Where consistent practices have resulted in a significant disparate impact among races, the discriminatory intent may be established by any evidence which logically supports the inference that state action or policies were adopted for invidious purposes. Such "logical" evidence includes the statistics of racial impact, the historical background of the decision which led to such impact, the contemporaneous statements of the members of the decision-making body, and the presence of actions from which disparate impact is foreseeable," *at* 888.[1]

The *Bratton* and *Young* decisions appear to reject the argument that has been advanced by the Plaintiffs. Thus, their reliance upon *Central Alabama Paving* appears to have been misplaced.

This Court is not faced with a Congressional finding, but with a finding of a State legislature whose elected representatives, like those of Congress, are called upon to set policy "rather than to apply settled principles of law." Its role is "representative rather than impartial," *Fullilove* 448 U.S. at 502, 100 S.Ct. at 2787. In addition, the Constitution imposes upon States a duty to eliminate the present effects of past discrimination, *Detroit Police Officers Association v. Young,* 608 F.2d 671 (6th Cir.1979). Moreover, the Legislature need not make specific findings of past discrimination, *Valentine v. Smith,* 654 F.2d 503 (8th Cir.1981).

This Court is of the opinion that the Defendants' evidence of a prior discrimination need not exceed that level which is articulated in *Bratton.* In fact, inasmuch as the Legislature is the ultimate policy-

making body of the State and the nature of the decision-making process in the legislative setting is analogous to that of Congress, it may rely upon any evidence which logically supports the inference of prior discrimination. Thus, this Court concludes that the findings which are required of the Michigan Legislature need not rise to the level of those which are required of judicial or administrative bodies.

The Court must examine the record to determine whether the Michigan Legislature's decision was based upon evidence from which it could logically infer that minorities and women were discriminated against prior to the enactment of P.A. 428.

The history of P.A. 428 reflects that, as early as 1971, the State began to recognize the problems of women and minorities in securing more than a miniscule portion of the millions of dollars in contracts awarded annually by various agencies within the State. This recognition was reflected in an Executive Memoranda concerning House Bill No. 4394 (1971). The primary thrust of this proposed legislation was to "liberalize the bonding requirements for government construction projects" which, in turn, would increase the amount of small business participation in government contracts and procurements. It was thought that this legislation would ultimately benefit minority businesses, who would normally fall within the classification of "a small business."

House Bill 4394, which was designed to amend existing legislation would have (1) increased the exemption for bonding requirements for contractors seeking work on public buildings from $5,000 to $25,000, (2) allowed small businesses to file an acceptable letter of credit in lieu of posting a performance or payment bond, and (3) required a bond of only 25% of the total contract amount rather than 50% under existing legislation. A governmental analysis of this Bill indicated that it would benefit the State, as well as the small business

---

1. As noted earlier, *Bratton* was decided in the context of public employment. Nonetheless, as noted above, *Fullilove* does not mandate that a more stringent test be applied to an attack on a legislative enactment that is designed to ameliorate the present effects of past discrimination.

community. The infusion of small business into the State procurement process would increase the number of contractors who could bid on a project, which would ultimately result in an increase in competition and a sizeable savings for the State.

The concern of the State for the plight of small and minority owned businesses did not cease with the proposed legislation. In 1974, it commissioned a study by Urban Markets Unlimited [Urban Market], a Wisconsin based firm, to explore the State's procurement policies and its effects upon minorities. Urban Market's report, *A Public Procurement Inventory on Minority Vendors,* which was issued in July 1974 contained startling revelations concerning the participation of minorities in the State's procurement of goods and services. It also disclosed certain unfounded negative attitudes toward minority contractors by those departments who had been charged with the responsibility of awarding an enormous variety of contracts.

The Report initially noted the substantial increase in government purchases from 1961 to 1971. The total purchases by state, local and federal government, throughout the entire nation in 1971, exceeded 108 Billion Dollars which represented a 91% increase over a ten year span. At the time of the Report, Michigan expended $437 Million annually on goods and services. These purchases ranged from construction and maintenance of highways and buildings to food products, napkins and paper. They covered all aspects of construction, industrial, commercial and service markets (Ex. 19B, p. vii).

The Report then stated that minority owned businesses, which are often described as being synonymous with small business, have demonstrated a genuine potential for substantial growth in all segments of the economy. These enterprises have expanded into "contract construction, electronic manufacturing, banking and insurance, consumable product distribution, building and grounds maintenance, metal fabricating, publishing, entertainment, food processing and cosmetics manufacturing" (Ex. 19B, p.

iiii). A survey of "The Top 100" Black businesses indicated that their growth compares favorably with that of the "Fortune 500" companies. Thus, minority owned businesses represented, and continue to represent, a viable and expanding segment of the American economy.

Against this background, the Report examined the procurement opportunities that were available to minority businesses in Michigan. From the outset, it appeared that the record of the State in this area was less than glowing. At the time of the Report, there were over 8,000 minority firms in the State of Michigan with gross receipts of $319 Million. Nearly 75% of these firms were located within the metropolitan Detroit area. A sampling of 1665 purchasing documents (representing expenditures of over $21 Million) revealed that only four minority firms had done business with the State. These purchases totaled a mere $155.00 or 0.0007% of $21,338,823.00 in State expenditures (Ex. 19B, p. 23). Despite this dismal performance, a majority of the State agencies who were sampled "felt [that] the State's purchasing system was equitable to all vendors" (Ex. 19B, p. 22).

The Report next focused on the procurement practices and policies of twenty-six State agencies regarding minority vendors. The most utilized method for purchasing was the Request for Quotation [RFQ] whereas the least utilized means was advertising. Vendors were solicited to bid on a project or commodity through the RFQ. Only approved vendors were permitted to bid on State contracts. Those vendors, who expressed a desire to bid on State contracts, were required to seek approval from the Purchasing Division of the Department of Management and Budget. Applications were made available by mail. This Department was charged with determining the qualification and reliability of a prospective vendor primarily on the basis of the information that was contained in the application. The approved vendors were then placed on an active bidders' list by commodity area. It is from this list that the agencies selected vendors to receive a RFQ.

However, an Auditor General's report revealed that (1) several applications were neither available nor on file and, therefore, could not be verified against the vendors who had been listed on the bidders' list, and (2) many vendor applications had been lost, discarded, misfiled or sent to the State Records and Publications Center. The Auditor General also noted that the standard procedure for approving vendors had not been observed in many cases. Rather, "reliable and approved vendors [were] solicited from various sources" such as (1) the Thomas Register of American Manufacturers, (2) yellow pages of city telephone directories, (3) personal visits by vendors and their salesmen who carried credentials which had been deemed to be satisfactory by staff members, and (4) bid opening lists on bulletin boards of the Purchasing Division.

There is nothing to indicate that the selected vendors were required to provide the financial and other pertinent information which was required in the standard application. In addition, there is no indication that an evaluation of the qualifications or reliability of the approved vendors was undertaken before they were placed on the active bidders' list. The Report notes "(i)f the explanation given the Auditor General's Office . . . is appropriate, it means that the division has wide discretionary authority in approving vendors for the bidders' list. This could have important ramifications on approval of minority vendors for the bidders' list" (Ex. 19B, p. 51).

Although the Report does not attempt to articulate or identify the nature and extent of these ramifications, it does contain insightful information concerning the practices and policies of State purchase authorities toward minorities. Only three of the twenty-six agencies had any official policy toward minorities. Only five of the agencies maintained sources for minority vendors or actively sought minority vendors. Nevertheless, twenty-two of the agencies

indicated a willingness to utilize minority directories.[2] Yet, there is no indication that these agencies consulted the State's Directory of Minority Businesses[3] in order to identify minority vendors and include them on the active bidders' list under the informal procedure described in the Auditor General's Report. Urban Market also reported that the attitudes of the twenty-six agencies' purchasing agents toward minority businesses strongly demonstrated their collective unwillingness to deal with minority vendors.

Urban Market also reported that a majority of the purchasing agents within the surveyed agencies expressed negative attitudes toward minority vendors. They believed that minority vendors were (1) noncompetitive, (2) lacked an established "track record," and (3) provided poor service and delivery, even though they had not had any actual experience with minority vendors. The available data in the Report does not support these perceptions. The Report concluded that there was substantial evidence to indicate that minority firms in Michigan are as competent, or in some instances, more competent than non-minority firms. A nationwide survey of private industry purchasing managers, who actually did business with minority firms, found that seventy-four percent of the purchasing agents felt that minority firms performed as well as non-minority firms, seven percent felt that minority firms performed better than non-minority firms, and only nineteen percent felt that minority firms performed worse than non-minority firms. This performance profile covered four major categories: (1) supplies and services, (2) parts and components, (3) raw materials, and (4) tools and equipment. In addition, minority firms in Michigan operate in a broad spectrum of the industrial market.

In 1974, six of the "Top 100" Black Enterprises were located in Michigan. Further, the United States Department of

2. Two agencies expressed an unwillingness to use minority directories. The reply of the remaining two agencies is cataloged as "other response."

3. Three agencies did indicate that they consulted minority directories when selecting vendors to receive RFQ.

Commerce publication "Minority Owned Businesses: 1969" indicated that there were 8,112 minority firms doing business in Michigan. Over half of those firms had the potential to supply a wide range of industrial markets.[4] "The result[s] of the 'Purchasing' survey and other private industry experience appears to dispel some of the commonly held assumptions that minority firms are incompetent, do not exist to any degree in the industrial materials supply area and are not competitive" (Ex. 19B, p. 74).

Finally, the Report made it clear that the negative attitude of State purchasing authorities toward minority vendors would cripple any steps toward achieving equity in the State's purchasing policies. "To rationalize that the lack of success in minority procurement is based upon minorities incompetency and non-responsiveness is not supported by the evidence. Continuing to do so will maintain the 'status quo' and void the State of an opportunity to increase its competitive sources of supply and the economic development of a sizeable portion of the State's population" (Exhibit 19B, p. 75).

Based on their study, Urban Markets reported that (1) "the States purchasing practices are not equitable in the treatment of minorities," and (2) the State does not actively seek new sources of vendors and this does not comport with its stated policy to "[e]ncourage by every legitimate means, actual and vigorous competition for State business." The Report, in concluding that the State could not hope to achieve equity in its treatment of minority business unless it exhibited the "will to do business," stated that "those who have achieved success in this area all have definitive policies which include at least the following ingredients: (a) a declaration of intent to do business, (b) actively encourages and seeks business and (c) a mechanism for insuring reasonable

compliance with the stated policy. It is inconceivable that the State can increase minority procurement without a policy to that effect" *id.*

The publication and dissemination of the Report spawned legislative and executive action. In June of 1975, the State Senate introduced Senate Bill 885, which was designed to establish a "set aside" program for small businesses. This Bill was followed by Senate Bill 1461 (1976) and Senate Bill 10 (1977). Each of these Bills addressed a set aside for small businesses. Although none of the Bills expressly sanctioned a set aside for minority businesses, their legislative history and analysis indicate that they were designed, in part, to address the perceived problems which faced minority businesses. Senate Bill 1461 specifically attempted to set aside contracts for "socially or economically disadvantaged persons." The Department of Commerce recommended that the proposed legislation be amended to read: "Minority Business Enterprise means a business enterprise that is owned or controlled solely by 1 or more socially or economically disadvantaged persons. The disadvantage may arise from cultural, social, chronic economic circumstances or background, or other similar cause" (Ex 19A, p. 3).

Norton L. Berman [Berman], Director of the Office of Economic Expansion, Michigan Department of Commerce, in testimony before the Senate State Affairs Committee regarding enactment of Senate Bill 1461, reported that voluntary efforts by the State were under way to assist minority firms in securing State contracts. Nonetheless, he encouraged the Legislature to enact the set aside legislation. Berman stated, in part:

> Since the beginning of our efforts to involve minorities in State procurement,

---

4. In addition to the information actually compiled by the State, there was also available statistical information compiled by the Census Bureau of the United States Department of Commerce. The Economic Census of 1977 contained statistics on the number of businesses owned by Blacks, Asian-Americans, American Indians, Spanish Americans and Women in Michigan, as well as the other forty-nine states.

For example, the census showed 8,498 Black owned businesses in Michigan with gross receipts of $449,303,000 Dollars. In addition, the areas of such businesses were broken down into nine categories: (1) construction, (2) manufacturing, (3) transportation and public utilities, (4) wholesale trade, (5) retail trade, (6) finance, insurance and real estate, and (7) selected services.

considerable discussion has occurred and volunteer efforts put forth to develop programs within the State Departments to involve minority businesses. We are happy to see these efforts, but remain concerned that until there is a statute mandating these efforts, there is a danger these efforts will not be ongoing. I am aware there are those who view this legislation as preferential treatment and the distortion of the competitive spirit of purchasing. I agree that this might be considered so, but unorthodox methods are needed to create opportunities for a major segment of our society that can contribute more to our economic stability. With regards to competition, what we have now in many industries is competition among the small operators and domination by a few large firms. Large businesses often can sell at a considerable lower price because of high volume sales, more efficient distribution systems and more advertising and promotion. Small businesses cannot equitably compete because of these disadvantages of size (Ex. 19A(26) pp. 5–6).

Berman's testimony included specific references to the efforts of other States in fostering or encouraging small and minority business participation through legislative enactment or executive order. Particular reference was made to the results in Minnesota after it had enacted legislation which was similar to Senate Bill 1461. After only one year of operation under the statute, Minnesota exceeded the legislative mandate of a 10% set aside for small and minority businesses by 24%. In addition, it added 170 new vendors to its bidders' list, of which 60 were small businesses and 110 were socially or economically disadvantaged vendors. Berman noted that Minnesota's Director of Purchasing had not perceived any problem with the program.

Senate Bill 1461 did not go without criticism. Its most notable critic was the Department of Management and Budget [DMB] which considered the Bill to be costly and abhorred the percentage goals as arbitrary and possibly unworkable. It felt that socially and economically disadvantaged firms would not be able to furnish 10% of the State's procurements. Moreover, DMB adhered to its earlier position that the State's procurement policies had been grounded on a tradition of competition and "produced honest and efficient practices." It recommended that the State need only provide assistance and encouragement to small and minority firms by providing information and technical assistance (Ex. 19A(7)). The comments of the Department reflected upon its earlier position that small and minority businesses failed to fully participate in the State's procurement because of their own incompetence and inadequacies. This attitude persisted even in the face of a comprehensive study which revealed that such attitudes were unfounded. Neither Senate Bill 1461 nor Senate Bill 10 were adopted by the Legislature.

In the midst of this legislative action, the Governor mounted a program of his own. On July 28, 1975, he issued Executive Directive 1975–4 (Ex. 19D) which created a Task Force on Small Business Participation in State Purchasing [Task Force]. The Directive reiterated the State's policy of encouraging "full participation by all facets of the business community, large and small." Nonetheless, it recognized that despite this policy "there [was] a need to take further steps to ensure full participation in state purchasing by small businesses." In addition, it placed particular emphasis on minority businesses who have "historically had greater difficulty getting into the mainstream of our American business enterprise system."

The Task Force was directed to (1) review existing rules and regulations of state purchasing to determine "whether impediments may exist," that prevent small businesses from fully participating in State procurement, (2) review state law regarding procurement procedures and determine necessary and appropriate measures to enhance small business opportunities, and (3) consult public and private agencies, organizations and individuals. The Governor specifically directed the Department of Management

and Budget to cooperate with the Task Force in (1) identifying the percentage of state contracts awarded to small businesses, (2) appraise the methods used to notify prospective bidders of the availability of state contracts, (3) analyze present procedures to determine whether smaller awards would increase participation, and (4) propose modifications in procedure to accomplish the goals of the Directive.

In furtherance of its mandate, the Task Force conducted two public hearings in order to obtain an input from the business community and to obtain their perceptions of State procurement policies. The attendees expressed the following views:

(a) State government appears to have a large and complex procurement structure with few unifying forces and few common policies and procedures.

(b) Procedures for dissemination of procurement information to small and minority business enterprises are inadequate.

(c) Because of their limited resources, small and minority business persons require more time between the advertising and the opening of bids in which to prepare their bid documents than that provided by current state procurement procedures.

(d) In some instances, procurement specifications appear unnecessarily narrow, i.e., specifying branded items which may be unavailable to them.

(e) State purchases and contracts, in many cases, are too large for small and minority businesses to accommodate.

(f) The State does not require contractors to solicit bids from small and minority subcontractors.

(g) Because of their limited financial resources, small and minority business enterprises require more prompt payment of invoices than the method which is provided by current state procurement procedures.

(h) The necessity of investing funds prior to the award of bids or contracts creates a hardship for small and minority business enterprises.

(i) Because of their limited resources and experience, small and minority business enterprises are frequently unable to meet state bonding and prequalification requirements.

(j) Small and minority business persons lack expertise in estimating and bidding.

Pursuant to the Directive, the Task Force issued its Final Report in March 1976, which contained numerous recommendations to accomplish the goals of the Executive Directive. Among these recommendations were provisions that each State agency (1) adopt formal plans and procedures to implement the State's small and minority business procurement policy, (2) establish goals for participation of small and minority businesses, (3) create a Small/Minority Business Procurement Council to (a) monitor the State's procurement efforts in this area, and (b) develop guidelines to streamline state procurement procedures in a manner which addresses the concerns expressed by small and minority businesses.

As a result of the Task Force's findings, the Governor issued Executive Directive 1976–4 on September 21, 1976. This Directive stated, in part, "the policy of the executive branch agencies of the State of Michigan shall be to aid, counsel, assist and protect the interests of small and minority business concerns in order to preserve free competitive enterprise and to insure that a fair proportion of the procurement of state agencies and agencies of the state be placed with small and minority business enterprises" (Ex. 19D, p. 8). To this end, the Governor established the Small and Minority Business Procurement Council, and directed each State agency to cooperate with the Council so that the objectives of the policy might be achieved. The Governor also directed the Council to submit an annual report, which would evaluate the implementation of the small and minority business procurement policy.

In 1977, the Council issued its First Annual Report. The total State agency commitment for fiscal year 1976–1977 to small

businesses was set at 23% while that set for minority businesses was 1%. At the end of the fiscal year, the commitment for minority businesses had been reached and the commitment for small businesses was exceeded by 30%. The Task Force noted "[t]here is little doubt that the imminence of Senate Bill Number 10 had a stimulating effect upon departments, especially during the latter part of fiscal year 1977" (p. 2). (Senate Bill 10 proposed a "set aside" for small and minority businesses).

On December 6, 1975, the Governor issued Executive Directive 1975–6 "Civil Rights Compliance in State and Federal Contracts" (Ex. 19E), and directed the Michigan Department of Civil Rights to:

(1) Establish standards and procedures for assuring non-discrimination in the provision of state programs, services and funds which are available directly or indirectly through the State of Michigan.

(2) Provide state departments, agencies and institutions with assistance in developing their internal procedures for requiring compliance with non-discrimination requirements consistent with the state-wide standards and procedures.

(3) Monitor and review the procedures adopted by departments, and agencies to assure compliance with the standards established by the Directive.

(4) Review state laws that establish programs and services and report to the Governor, executive or administrative action that might be appropriate to encourage non-discriminatory applications of those programs consistent with the objectives of the Directive.

(5) Provide an annual report to the Governor with respect to compliance by state agencies with the policies established by the Directive.

On May 15, 1978, the Department of Civil Rights [MCRC] issued a Report, which expressed concern over the limited progress that had been made in implementing Executive Directive 1975–6 because of (1) the lack of availability of staff in some agencies, (2) the inexperience of personnel in dealing with civil rights matters, and (3) the intense involvement of the MCRC staff in evaluating and assisting in every review. Particular concern was expressed about some departments who, after making a commitment to comply with the Executive Directive 1975–6, "subjected the process to repeated delays resulting in little or no implementation. Two of the departments with the largest grant programs, both in terms of numbers and monetary value, raised legal questions that have severely limited implementation."

All of this information was available to the Legislature on March 15, 1979 when the House initiated House Bill 4335. The original House Bill 4335 proposed a set aside of 20% of state contracts, 13% for small businesses and 7% for minority businesses. In February 1980, the proposed set aside provision for small businesses was dropped and a 5% set aside section for women was added. In its final form, the absolute set aside language was removed from the Bill. Instead, the proposed legislation provided for a gradual attainment of ultimate percentages of contracts for minority and woman owned businesses. This was to be accomplished by increasing the percentage of actual expenditures to these businesses over a four year period in the case of minorities and a five year period in the case of woman owned businesses.[5]

DMB initially expressed concern that the absolute set asides could not be attained. The gradual implementation in the final draft appears to have been addressed to these concerns. By and large, however, the

---

5. The following chart shows the gradual increase in the percentage of expenditures designated for minority and woman owned businesses.

| | MINORITY | | FEMALE | |
|---|---|---|---|---|
| | % of prior year | % of base | % of prior year | % of base |
| 1979–80 Est. | | 1.0 | | .25 |
| 1980–81 | 150 | 1.5 | 150 | .375 |
| 1981–82 | 200 | 3.0 | 200 | .750 |
| 1982–83 | 200 | 6.0 | 200 | 1.5 |
| 1983–84 | 116 | 7.0 | 200 | 3.0 |
| 1984–85 | | | 140 | 5.0 |

executive departments supported the Bill as a means of increasing the participation of women and minorities in the activities of State government. Each analysis of the Bill reiterates this theme and the reasons in favor of legislative adoption of it:

> Statistical descriptions of the extent of participation in state programs by businesses controlled by women and minorities are varied and sometimes contradictory depending on the definitions used and the samples of state spending examined. These descriptions, however, all reveal that such businesses receive a disproportionately small share of state spending for construction and goods and services in relation to their proportion of the state's population. That minorities and women have been systematically denied equal opportunity in this country is sad historical fact now generally accepted and widely recognized in legislation of the past two decades. In the interests of justice as well as the social and economic health of the state, the legislature should do all that it can to ensure that businesses owned by minorities and women obtain their fair share of the state's business. (Ex. 19A(17), p. 2).

House Bill 4335 was finally adopted by the Legislature two years after its initiation and became Public Act 1980, No. 428, which took immediate effect on January 13, 1981.

Plaintiffs say that this record does not support a finding of past discrimination. In particular, they argue that the record merely sets forth "the history of the western world for the past 200 years, laws in this country that have imposed inferior status on minorities and women; the statutory scheme upheld in *Fullilove*, various exhibits discussing P.A. 428 and similar Acts proposed but not passed; and various exhibits demonstrating the low dollar percentage of state contracts obtained by minority owned businesses." Moreover, they assert that the record reveals that the lack of participation by minorities has nothing to do with discrimination but is attributable to the complexity of the procurement procedures by the State and the lack of resources available to small and minority businesses. They further contend that, in the face of this evidence, the State has attempted to "magically" transform a mere statistical disparity into a finding of past intentional discrimination.

This Court must reject Plaintiffs' contentions that the Legislature findings were unrelated to the conditions within the State. The evidence before the Legislature amounted to much more than a general assertion of past discrimination against minorities and women in this country over the "past 200 years." As the record clearly indicates, much of the evidence, which was relied upon by the Legislature prior to the adoption of P.A. 428, was specifically addressed to the plight of minority businesses within the State.

Next, Plaintiffs strenuously contend that the Legislature cannot rely on statistical evidence alone to support a finding of past discrimination, particularly where there is evidence to support a contrary result. Statistical evidence alone may, in some circumstances, demonstrate a constitutional violation, *Detroit Police Officers Assn. v. Young, supra*, 608 F.2d 671, 686.

Even though a limited survey of small and minority businesses supports the belief that the State's complex purchasing procedures contributes to minority businesses' inability to participate fully in State procurements, those perceptions do not negate the unmistakable conclusions which are drawn from the statistical evidence. The testimony of Berman before the Senate shows that the Executive Branch had taken steps to assist small and minority businesses in dealing with the complexities of State procurement prior to the introduction of Senate Bill 1461. The Office of Economic Expansion [OEE], through its Division of Minority Business Enterprise and Small Business Development [DMBE], provided assistance in "management/administrative training programs, problem solving with governmental regulatory agencies, and financial resource development" (p. 2) prior to the enactment of P.A. 428. Moreover, while it appears that the Senate procurement policies ad-

versely affected small and minority businesses, the impact upon the minority business community was more severe and persistent.

A comprehensive study, *A Public Procurement Inventory of Minority Vendors,* showed that State purchasing agents harbored unfounded negative attitudes toward minority businesses which hampered efforts to increase minority participation in State procurement. The 1978 MCRC Report demonstrated that, even after Executive action to correct a "statistical" imbalance had been implemented, these attitudes had not lessened and threatened to further hamper Executive efforts in this area. Following the issuance of Executive Directive 1975–4, small business participation reached 26% of all State procurement for the 1976 fiscal year. In that same year, minority businesses obtained only 1% of all State contracts. During the same period of time, there were over 8,000 minority businesses in the State, whose activities span a wide range of goods and services and at least six of those businesses are among the Top 100 Black businesses in the country. Under these circumstances, an inference of discrimination can hardly be termed "magical."

Plaintiffs next contend that (1) the actions of the Michigan Legislature were not the same as those of Congress when it decided to adopt the MBE statute, and (2) the Michigan Legislature merely refers to the *Fullilove* decision to support its actions. The record before this Court demonstrates that the actions of the Michigan Legislature virtually paralleled that of Congress. In *Fullilove,* the Supreme Court noted that Congress first attempted to address the under-participation of minorities through § 8(a) of the Senate Small Business Act, Public Law 85–536. Under the Act, the Small Business Administration [SBA] was permitted to assist small businesses in contracting to furnish goods and services to the Federal Government. In 1968, the President directed the SBA to develop a program to assist small businesses who were owned or controlled by "socially or economically disadvantaged [persons] to achieve a competitive position in the economy." In a 1975 Report, the House Subcommittee on SBA Oversight and Minority Enterprise expressed its disappointment in the limited effectiveness of § 8(a) of the Small Business Act. It noted that minorities received only 0.65% of Government contracts. The General Accounting Office and the United States Commission on Civil Rights also expressed dissatisfaction with the limited success of § 8(a). In addition, the Congress had a report from the Office of Minority Business Enterprise [OMBE] which concluded "that OMBE efforts were 'totally inadequate' to achieve its policy of increasing opportunities for subcontracting by minority businesses on public contracts. OMBE efforts were hampered by a glaring lack of specific objectives which each prime contractor should be required to achieve by a *'lack of enforcement provisions' and by a 'lack of any meaningful monitoring system,'*" *Fullilove* at 467, 100 S.Ct. at 2769 (emphasis added), *citing* H.R.Rep. No. 94–468, 1975.

In the present case, the State initiated a similar small business "set aside" act (Senate Bill 1461). The Senate then introduced Senate Bill 10 which included particular assistance for businesses that were owned or controlled by "socially and economically disadvantaged" persons. The definition of such persons is essentially the same as that which had been promulgated by the SBA in connection with § 8(a). The initiation of these Bills in the Legislature was accompanied by Executive action. The Reports from the MCRC, Small Business Task Force, and the Small and Minority Business Procurement Council all reached the same basic conclusions as those that were submitted by various commissions to Congress on the effectiveness of § 8(a). Each of these Reports noted that executive programs had been hampered by bureaucratic recalcitrance. One study noted that the impetus toward even limited success was caused by the imminence of set aside legislation (Senate Bill 10).

Plaintiffs seem to suggest that this Court should require the State to trace the exact legislative and executive steps which had

been taken by the Federal Government in *Fullilove* and hold that the State cannot rely on the experience of the Federal Government. In view of this record, Plaintiffs' position would appear to be untenable. Although the Michigan Legislature did not pass Senate Bills 1461 or 10, the State should not be required to retrace the unsuccessful path of the Federal Government because (1) the Michigan Legislature could take notice of the Federal Government's admitted failure in assisting minorities through § 8(a) of the SBA, and (2) on the basis of various reports, studies and executive actions, it was apparent that the bureaucracy's intransigence required specific enforceable legislation. The record in this case is but a microcosm of the national record before Congress when it passed the MBE.

■ For this reason and the reasons previously cited, this Court must reject Plaintiffs' contentions. This Court finds that there was sufficient evidence before the Legislature to make a finding of past intentional discrimination.

■ Having determined that the State has established its interest in ameliorating the present effects of past discrimination, this Court must now determine whether P.A. 428 is a reasonable means of achieving that end. In considering this question, the Court must examine (1) whether any group or individual is stigmatized by the implementation of the Act, and (2) whether the race and sex classifications have been reasonably drawn in light of the Act's objectives, *Bratton, supra,* at 887. A party who attacks a race or sex conscious remedy must demonstrate that it manifests a "constitutionally impermissible stigma," *Bratton, supra,* at 891. To determine whether a remedy lacks the indicia which is associated with an "impermissible stigma," Courts have looked to (1) whether the beneficiaries (minorities or women) of the remedy are qualified for the position thus granted, *Bratton, supra,* at 891; *Valentine v. Smith, supra,* at 511, (2) the actual burden shouldered by the

white majority, in light of the scope of the program, *Fullilove, supra* 448 U.S. at 484, 100 S.Ct. at 2777.

The record before this Court demonstrates that P.A. 428 provides adequate safeguards to assure that those persons who are granted awards under its provisions are as qualified as their majority counterparts. In addition, the program does not force an undue burden upon the majority contractors. Section 2 Paragraph (5) of the Act, M.C.L.A. § 450.772(5) provides that "minority and woman owned businesses shall comply with the same requirements expected of other bidders including but not limited to being adequately bonded". Under these circumstances no stigma attaches to either class.

This Court must also consider the burdens that have been placed upon the white majority in connection with the implementation of P.A. 428. In Michigan, procurement exceeds over 437 million dollars per year. The ultimate percentages set aside for minority and woman owned businesses is 7% and 5% respectively. Under the Federal MBE, 10% of all contracts were set aside for minorities alone. Justice Burger found that the MBE's 10% set aside resulted in a relatively light burden for non-minority firms in light of the scope of program "as compared with overall construction contracting opportunities" in the public and private sectors, *Fullilove* at 484, 100 S.Ct. at 2777.[6]

Here, too, the burden upon non-mincrity firms is light compared to their overall contracting opportunities. This is particularly true because the non-minority firms attack a set aside which addresses all segments of the State's procurement activities, not just the highway and building construction. The overall opportunities for the State and private sectors are enormous. Under these circumstances, it is not unreasonable for these non-minority contractors to "share the burden" of ameliorating the present

**6.** See note 72 at 484, 100 S.Ct. at 2778. The Commerce Department estimated that over 170 Billion Dollars was spent on construction in the United States in 1977.

effects of post discrimination, *Fullilove* at 484, 100 S.Ct. at 2778.

Finally, this Court must address the reasonableness of the Act. "This test encompasses a variety of considerations which may vary given the nature of the preference plan to be considered and the circumstances surrounding its implementation," *Bratton* at 892. No one characteristic is determinative of what is constitutionally reasonable, *id.* In *Fullilove,* the Supreme Court enumerated the characteristics of the MBE which made it constitutionally permissible: (1) the program was a strictly remedial measure, (2) it functioned prospectively, (3) the plan was open only to qualified, bona fide MBE's, (4) technical assistance is provided as needed, (5) the 10% set aside may be waived if qualified, bona fide MBE's are not available, (6) there was an administrative mechanism, including a complaint procedure to ensure that only bona fide MBE's are encompassed and to prevent unjust participation by those who have not suffered from prior discrimination, and (7) the program was appropriately limited in extent and duration.

Public Act 428 contains all of these characteristics. As discussed in detail earlier, the Act is strictly a remedial measure that is designed to ameliorate the present effects of past discrimination. The Act functions prospectively and it clearly requires all minority and women vendors to meet the same qualifications as their majority counterparts. Next, technical assistance is provided through the OEE. In addition, P.A. 464, M.C.L.A. § 450.781 et seq., establishes a Small Business Development Program to provide small businesses with information, managerial, and technical assistance, and to assist the Legislature in developing and strengthening small businesses within the State.

Although P.A. 428 does not contain a mechanism for an administrative waiver, it does specifically provide that if no qualified minority or woman owned businesses are available to bid upon a contract, the contract will go to a majority business, M.C. L.A. § 450.772(6). Next, pursuant to P.A. 428, administrative procedures have been promulgated by the Office of Human Resource Policy and Special Projects to implement the Act.

Among these procedures is a mechanism for "Verification of Status." All applicants, who seek to claim the status of a minority or woman owned business, must submit a verification form containing: (1) the legal, financial and operating interests of the business, and (2) an attestation to the accuracy of the information. If any contracting department has good reason to believe that a person does not meet the standard for a minority or woman owned business, it may request (1) additional information of the applicant, (2) an investigation by the Department of Civil Rights or (3) action by the Attorney General if it appears that a person has misrepresented his or her status.

These administrative procedures also contain a complaint mechanism, whereby any business or firm, which has submitted a bid and been denied a contract, "may file a complaint with the Department of Civil Rights, alleging that the denial was unfair and that the unfairness resulted from the administration of [P.A. 428]." The Procedures also include an appeals process.[7]

Finally, Section 3 of the Act, M.C.L.A. § 450.773 requires the Governor to submit a

---

7. P.A. 428 itself requires that a person certify his or her status: A person who wishes to be certified as a minority owned or woman owned business shall complete a sworn affidavit that the person is a minority owned or woman owned business and is prepared to bid on state contracts. All ownership interests in the business shall be specifically identified in the affidavit. The affidavit shall be filed with the governor or a department designated by the governor.

The Act also provides for penalties for anyone who fraudulently procures a contract: "A person who knowingly violates or conspires to violate this act, or who knowingly and fraudulently procures or attempts to procure a contract with this state as a minority owned or woman owned business is guilty of a felony, punishable by imprisonment for not more than 2 years, or a fine of not less than $5,000.00, or both. A person who violates this act shall be barred from obtaining future contracts with the state."

semi-annual report to the Legislature which will detail the results of the State's procurement policy and the actual number and dollar volume of contracts that have been awarded to minority and woman owned businesses during the reporting period.

Plaintiffs contend that P.A. 428 does not comport with the tenets of *Fullilove* because the remedy is improperly tailored to its objectives. Specifically, they contend that the Act does not (1) insure that only those businesses which have suffered from prior discrimination will receive the benefit of the set aside, or (2) have a termination point. Plaintiffs argue that *Fullilove* makes it clear that these characteristics are essential to a finding of constitutionality.

A careful reading of *Fullilove* discloses that Plaintiffs' interpretation is in error. It is true that Chief Justice Burger noted that the administrative mechanism of the MBE contained provisions "to prevent unjust participation in the program by those minority firms whose access to public contracting opportunities is not impaired by the effects of prior discrimination," at 482, 100 S.Ct. at 2776. This passage cites pages 471–472, 100 S.Ct. at 2771 of the opinion, which referred to regulations that specifically define "minority" and to a complaint procedure which is almost identical to that in the Michigan Administrative Procedures.[8] Contrary to the argument of the Plaintiffs, the *Fullilove* Court did not enunciate a standard which requires that persons who seek the benefits of the MBE must show that they were actually the victims of past discrimination.

It is also true that Justice Burger found it significant that the MBE was of limited duration, but the full passage of the notation reveals the true significance of that provision:

The MBE provision may be viewed as a pilot project, appropriately limited in extent and duration, and subject to re-assessment and re-evaluation by Congress prior to any extension or re-enactment. Miscarriages of administration could have only a transitory economic impact on businesses not encompassed by the program, and would not be irremediable.

*At* 489, 100 S.Ct. at 2780.

Nowhere in the Supreme Court's opinion is there a statement which requires that a remedial act be of limited duration. The concern expressed by the Chief Justice was that Congress, by limiting the duration of the Act, would have an opportunity to assess its progress. If the Act had achieved its objectives, then Congress would not need

---

**8.** The sections referred to are in the Appendix of Chief Justice Burger's opinion at 494–495, 100 S.Ct. at 2782–83, and reads as follows:

¶ 3. The EDA Technical Bulletin, at 1, provides the following definitions:

"a) Negro—An individual of the black race of African origin.

"b) Spanish-speaking—An individual of a Spanish-speaking culture and origin or parentage.

"c) Oriental—An individual of a culture, origin or parentage traceable to the areas south of the Soviet Union, East of Iran, inclusive of islands adjacent thereto, and out to the Pacific including but not limited to Indonesia, Indochina, Malaysia, Hawaii and the Philippines.

"d) Indian—An individual having origins in any of the original people of North America and who is recognized as an Indian by either a tribe, tribal organization or a suitable authority in the community. (A suitable authority in the community may be: education institutions, religious organizations, or state agencies.)

"e) Eskimo—An individual having origins in any of the original peoples of Alaska.

"f) Aleut—An individual having origins in any of the original peoples of the Aleutian Islands."

¶ 4. The EDA Technical Bulletin, at 19, provides in relevant part:

"Any person or organization with information indicating unjust participation by an enterprise or individuals in the MBE program or who believes that the MBE participation requirement is being improperly applied should contact the appropriate EDA grantee and provide a detailed statement of the basis for the complaint.

"Upon receipt of a complaint, the grantee should attempt to resolve the issues in dispute. In the event the grantee requires assistance in reaching a determination, the grantee should contact the Civil Rights Specialist in the appropriate Regional Office.

"If the complainant believes that the grantee has not satisfactorily resolved the issues raised in his complaint, he may personally contact the EDA Regional Office."

take any further action. If the Act did not achieve its intended objective, then Congress could reenact it. The essence of the durational limitation was to provide for "reassessment and re-evaluation" of the Act.

Although P.A. 428 does not contain a termination date, it does require the Governor to give semi-annual reports to the Legislature on the progress, if any, that has been made toward achieving its objectives. In this way, the Legislature can reassess and re-evaluate the Act every six months. Because of this safeguard, the absence of a termination date does not render the Act unconstitutional. P.A. 428 fully comports with the spirit and the language of *Fullilove*.

For all the foregoing reasons, this Court finds that P.A. 428 is constitutionally permissible and is not violative of the Equal Protection Clause of the Fourteenth Amendment. The Court also determines that the Act does not violate 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 2000d, or 42 U.S.C. § 2000e, *see Bratton, supra*. The Court finds that Plaintiffs' attack upon P.A. 428 is without merit. Thus, the Court denies Plaintiffs' Motion for Summary Judgment and grants Defendants' Motion for Summary Judgment.

SO ORDERED.