**MICHIGAN ROAD BUILDERS ASSOCIATION, INC., et al., Plaintiffs–Appellants,**

v.

**William G. MILLIKEN, et al., Defendants–Appellees.**

**No. 86–1239.**

United States Court of Appeals, Sixth Circuit.

Argued May 4, 1987.

Decided Nov. 25, 1987.

Rehearing and Rehearing En Banc Denied Feb. 23, 1988.

---

John B. Weaver (argued), Butzel, Long, Gust, Klein, and Van Zile, Detroit, Mich., for plaintiffs-appellants.

Brent E. Simmons (argued), Lansing, Mich., for defendants-appellees.

Before LIVELY, Chief Judge, and ENGEL and KRUPANSKY, Circuit Judges.

KRUPANSKY, Circuit Judge.

Plaintiffs-appellants Michigan Road Builders Association, et al. (Michigan Road Builders or plaintiffs) appealed from the district court's order granting summary judgment in favor of the defendants-appellees, (defendants) in this civil rights action commenced for the purpose of challenging the constitutional validity of 1980 Mich. Pub.Acts 428 (Public Act 428), Mich.Comp. Laws § 450.771, *et seq.*[1] In particular, the Michigan Road Builders charge that Public Act 428 which "set aside" a portion of state contracts for minority owned businesses (MBEs) and woman owned businesses (WBEs) impinges upon the Equal Protection Clause of the Fourteenth Amendment to the Constitution. Section 2 of Public Act 428, Mich.Comp.Laws § 450.772 provides that after the 1984–85 fiscal year, each state department must award not less than 7% of its expenditures for construction, goods, and services to MBEs and not less than 5% to WBEs.[2] Under Public Act

---

[1] Plaintiffs-appellants "are (1) several non-profit associations whose members are, in general, construction firms, contractors and suppliers, who have done, or are doing business with the State of Michigan, and (2) various profit corporations who have had, or seek, contracts with the State of Michigan." *Michigan Road Builders Ass'n v. Milliken,* 571 F.Supp. 173, 174 (E.D. Mich.1983). Defendants-appellees are William G. Milliken, the former Governor of Michigan, the Michigan Department of Management and Budget, Gerald H. Miller, the former Director of the Michigan Department of Management and Budget, the Michigan Department of Transportation, and John P. Woodford, the former Director of the Michigan Department of Transportation.

[2] Mich.Comp.Laws § 450.772 provides:

Sec. 2. (1) The construction, goods, and services procurement policy for each department shall provide for the following percentage of expenditures to be awarded to minority owned and women owned businesses by each department except as provided in subsection (6):

(a) For minority owned business, the goal for 1980–81 shall be 150% of the actual expenditures for 1979–80, the goal for 1981–82 shall be 200% of the actual expenditures for 1980–81, the goal for 1982–83 shall be 200% of the actual expenditures for 1981–82, the goal for 1983–84 shall be 116% of the actual expenditures for 1982–83, and this level of effort at not less than 7% of expenditures shall be maintained thereafter.

(b) For woman owned business, the goal for 1980–81 shall be 150% of the actual expenditures for 1979–80, the goal for 1981–82 shall be 200% of the actual expenditures for 1980–81, the goal for 1982–83 shall be 200% of the actual expenditures for 1981–82, the goal for 1983–84 shall be 200% of the actual expenditures for 1982–83, the goal for 1984–85 shall be 140% of the expenditures for 1983–84,

428, a "minority" is a "person who is black, hispanic, oriental, eskimo, or an American Indian," Mich.Comp.Laws § 450.771(e), and a "minority owned business" is "a business enterprise of which more than 50% of the voting shares or interest in the business is owned, controlled, and operated by individuals who are members of a minority and with respect to which more than 50% of the net profit or loss attributable to the business accrues to shareholders who are members of a minority." Mich.Comp.Laws § 450.771(f). A "woman owned business" is "a business of which more than 50% of the voting shares or interest in the business is owned, controlled, and operated by women and with respect to which more than 50% of the net profit or loss attributa-ble to the business accrues to the women shareholders." Mich.Comp.Laws § 450.771(j).

The Michigan Road Builders commenced the present action on July 8, 1981 in the United States District Court for the Eastern District of Michigan seeking declaratory and injunctive relief against the enforcement of the set-aside provisions of Public Act 428. In particular, the plaintiffs charged that the set-aside provisions of Public Act 428 violated the Equal Protection Clause of the Fourteenth Amendment, as well as 42 U.S.C. §§ 1981, 1983 and 2000d,[3] by according racial and ethnic minorities and women a preference in competing for state expenditures. After dis-

and this level of effort at not less than 5% of expenditures shall be maintained thereafter.

(2) If the first year goals are not achieved, the governor shall recommend to the legislature changes in programs to assist minority and woman owned businesses.

(3) Each department, to assist in meeting the construction, goods, and services procurement expenditures percentages set forth in subsection (1), shall include provisions for the accomodation of subcontracts and joint ventures. The provisions shall be established by the governor and shall require a bidder to indicate the extent of minority owned or women owned business participation.

(4) Only the portion of a prime contract that reflects minority owned or women owned business participation shall be considered in meeting the requirements of subsection (1).

(5) Minority owned or woman owned businesses shall comply with the same requirements expected of other bidders including, but not limited to, being adequately bonded.

(6) If the bidders for any contract do not include a qualified minority owned and operated or woman owned and operated business, the contract shall be awarded to the lowest bidder otherwise qualified to perform the contract.

3. 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 2000d provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Because the protections afforded by these sections are coextensive with the protections afforded by the Equal Protection Clause of the Fourteenth Amendment, *Regents of Univ. of Calif. v. Bakke,* 438 U.S. 265, 287, 333, 98 S.Ct. 2733, 2746, 2770, 57 L.Ed.2d 750 (1978) (§ 1983 and 2000d); *Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 691–92 (6th Cir.1979) (§ 1981), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), this court need only analyze Public Act 428 under Fourteenth Amendment equal protection standards. *See Associated Gen. Contractors of Cal. v. City & County of San Francisco,* 813 F.2d 922, 928 n. 11 (9th Cir.1987). Plaintiffs also alleged in their complaint that Public Act 428 violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See Johnson v. Transportation Agency,* —— U.S. ——, 107 S.Ct. 1442, 1446 n. 2, 94 L.Ed.2d 615 (1987) (suggesting that Title VII analysis differs from constitutional equal protection analysis). They have abandoned this argument on appeal.

covery had been completed, the parties filed cross motions for summary judgment, and on August 12, 1983, the district court determined that Public Act 428 did not violate the Equal Protection Clause of the Fourteenth Amendment and granted defendants' motion for summary judgment. *Michigan Road Builders Ass'n v. Milliken*, 571 F.Supp. 173 (E.D.Mich.1983). Michigan Road Builders appealed, and this court dismissed the appeal because the district court had not decided all of the claims against the Michigan Department of Transportation. *Michigan Road Builders Ass'n v. Milliken*, 742 F.2d 1456 (6th Cir.1984). Thereafter, the district court entered an order disposing of the remaining charges against the Department of Transportation, *Michigan Road Builders Ass'n v. Milliken*, 654 F.Supp. 3 (E.D.Mich.1986), and the Michigan Road Builders commenced this timely appeal. On appeal, the plaintiffs argued that the district court applied the incorrect legal standard to determine the constitutional validity of Public Act 428.

In addressing equal protection claims, the Supreme Court has employed differing levels of judicial review depending upon the type of imposed classification under constitutional attack.[4] "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (plurality opinion) (concluding that state medical school's admission program which reserved a specified number of student positions for racial and ethnic minority applicants violated the Equal Protection Clause). This "most exacting judicial examination" has been labeled by the Supreme Court as "strict scru-

tiny." *Id.* at 287, 98 S.Ct. at 2747 (plurality opinion).

> When a classification denies an individual opportunities or benefits enjoyed by others solely because of his race or ethnic background, it must be regarded as suspect.

> \* \* \* \* \* \*

> We have held that in "order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary ... to the accomplishment' of its purpose or the safeguarding of its interest."

> \* \* \* \* \* \*

> Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids.

*Id.* at 305–07, 98 S.Ct. at 2756–57 (plurality opinion) (citations omitted).

In *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Supreme Court probed a congressionally enacted affirmative action plan embodied in the Public Works Employment Act of 1977, 42 U.S.C. § 6701 *et seq.* The constitutional attack in that case was lodged against the "Minority Business Enterprise" set aside provision of the act, § 103(f)(2), 42 U.S.C. § 6705(f)(2), which required local governmental units receiving funds under public works programs to use 10% of the funds to procure services or supplies from MBEs. The court determined that "Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public con-

---

**4.** In considering equal protection claims, courts must first determine whether the governmental body imposing the classification at issue had authority to act to accomplish its purpose. *Fullilove v. Klutznik*, 448 U.S. 448, 473, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902 (1980) (plurality opinion); *Associated Gen. Contractors of Cal.*, 813 F.2d at 928. In the case at bar, the state asserted, and the plaintiffs did not dispute, that Public Act 428 was designed to ameliorate the effects of past discrimination against minorities and women competing for contracts to supply the state with goods and services. It is beyond

contention that a state legislature has the prerogative and even the "constitutional *duty* to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 1856, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring) (emphasis in original); *Ohio Contractors Ass'n v. Keip*, 713 F.2d 167, 172–73 (6th Cir.1983); *Associated Gen. Contractors of Cal.*, 813 F.2d at 929. Accordingly, it is not disputed that the Michigan legislature had jurisdiction to act for the purpose of ameliorating the effects of past discrimination.

tracting opportunities by procurement practices that perpetuated the effects of prior discrimination," *id.* at 477–78, 100 S.Ct. at 2774, and that the set aside provision therein at issue was "narrowly tailored to the achievement of [the] goal" of ameliorating the effects of that past discrimination. *Id.* at 480, 100 S.Ct. at 2776. Justice Powell, author of the *Bakke* opinion, concurred in the Court's opinion and filed an opinion in which he stated:

> Section 103(f)(2) [of the Public Works Employment Act of 1977] employs a racial classification that is constitutionally prohibited unless it is a necessary means of advancing a compelling governmental interest.
>
> \*　\*　\*　\*　\*　\*
>
> The Equal Protection Clause, and the equal protection component of the Due Process Clause of the Fifth Amendment, demand that any governmental distinction among groups must be justifiable. Different standards of review applied to different sorts of classifications simply illustrate the principle that some classifications are less likely to be legitimate than others. Racial classifications must be assessed under the most stringent level of review because immutable characteristics, which bear no relation to individual merit or need, are irrelevant to almost every governmental decision.

448 U.S. at 496, 100 S.Ct. at 2783–84 (Powell, J. concurring).

Subsequent to the *Bakke* and *Fullilove* decisions, this circuit considered constitutional attacks on state and local government mandated affirmative action plans. In assessing the constitutional validity of the affirmative action plans at issue in the post-*Bakke* and *Fullilove* cases, this circuit redefined the term "strict scrutiny" as it applied in affirmative action cases:

> [T]he first stage in our approach to affirmative action programs entails an analysis of the need for such remedial measures—i.e., with the presence of a governmental interest in their implementation. It is uncontested that the government has a significant interest in ameliorating the disabling effects of identified discrimination.
>
> \*　\*　\*　\*　\*　\*
>
> Once the governmental interest in some remedial action is thus established, we must proceed to determine whether the remedial measures employed are reasonable.

*Bratton v. City of Detroit,* 704 F.2d 878, 886–87 (6th Cir.1983) (footnote omitted), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). *See also Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671 (6th Cir.1979) (determining that no "direct showing of past intentional discrimination" by the governmental unit imposing the affirmative action plan was necessary and that the plan need only be a "reasonable" means of serving the governmental interest of eradicating the effects of past discrimination), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981); *Ohio Contractors Ass'n v. Keip,* 713 F.2d 167 (6th Cir.1983) (where compelling interest of state in ameliorating the past effects of its prior discrimination was clear, the affirmative action plan adopted need only be "reasonably calculated" to serve that interest). In these decisions, this court essentially relaxed the strict scrutiny standard enunciated by the Supreme Court in *Bakke* and *Fullilove.* Thus, this circuit essentially required that affirmative action plans be a "reasonable" means of furthering a "significant" governmental interest rather than a "narrowly tailored" or "necessary" means of furthering a "compelling" governmental interest.[5]

In *Wygant v. Jackson Bd. of Educ.,* 746 F.2d 1152 (6th Cir.1984), this circuit again

---

5. While the distinction between the terms "significant" and "compelling" may be negligible, *see Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 1853, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring) (discussing distinction between terms "compelling" and "important"), as discussed below, it is clear that the district court in the case at bar considered the terms as having different meanings when it expressly refused to require defendants to demonstrate a "compelling" interest, but instead required them to demonstrate a "significant interest." 571 F.Supp. at 176–77.

applied its relaxed standard of review to uphold an affirmative action layoff plan embodied in a collective bargaining agreement between a public board of education and a teachers' union. In reversing the decision, the Supreme Court rejected the relaxed level of judicial scrutiny imposed by this circuit in *Wygant:*

> This Court has "consistently repudiated '[d]istinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'"
>
> .... "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."
>
> The Court has recognized that the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination. In this case, [the collective bargaining agreement] operates against whites and in favor of certain minorities, and therefore constitutes a classification based on race. "Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." There are two prongs to this examination. First, any racial classification "must be justified by a compelling governmental interest." Second, the means chosen by the State to effectuate its purpose must be "narrowly tailored to the achievement of that goal." We must decide whether the layoff provision is supported by a compelling state purpose and whether the means chosen to accomplish that purpose are narrowly tailored.

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 1846–47, 90 L.Ed.2d 260 (1986) (plurality opinion) (citations omitted). Subsequent to rejecting the "compelling" nature of the governmental interests advanced by the board of education in support of the constitutional validity of the layoff plan, which interests had been found to be "sufficiently important" by this circuit, 106 S.Ct. at 1847–49, the Court continued:

> The Court of Appeals examined the means chosen to accomplish the Board's race-conscious purposes under a test of "reasonableness." That standard has no support in the decisions of this Court. As demonstrated ... above, our decisions always have employed a more stringent standard—however articulated—to test the validity of the means chosen by a state to accomplish its race-conscious purposes.[6] Under strict scrutiny the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose. "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."

---

[6] The term "narrowly tailored," so frequently used in our cases, has acquired a secondary meaning. More specifically, ... the term may be used to require consideration whether lawful alternative and less restrictive means could have been used. Or ... the classification at issue must "fit" with greater precision than any alternative means. "[Courts] should give particularly intense scrutiny to whether a nonracial approach or a more narrowly tailored racial classification could promote the substantial interest about as well and at tolerable administrative expense."

106 S.Ct. at 1849–50 (citations and footnote omitted). The Supreme Court left no doubt that the standard of judicial review previously employed by this circuit in racial and ethnic affirmative action cases was inappropriate.

In the case at bar, the district court, having issued its opinion nearly three years before the Supreme Court reversed this circuit in *Wygant,* erroneously decided the constitutional validity of Public Act 428 under this circuit's relaxed level of scrutiny:

> "A different analysis must be made when the claimants are not members of a class historically subjected to discrimination."

   \*    \*    \*    \*    \*    \*

Having determined that the law of this Circuit requires that the State must demonstrate *a significant interest in ameliorating the past effects of present discrimination rather than the "compel-*

*ling interest" standard ...*, this Court must examine the record to assess the nature of the interest of the State in enacting [Public Act] 428.

\*   \*   \*   \*   \*   \*

Having determined that the State has established its interest in ameliorating the present effects of past discrimination, this Court must now determine whether [Public Act] 428 is a *reasonable means of achieving that end.*

571 F.Supp. at 176–77, 187 (quoting *Bratton,* 704 F.2d at 887). The district court's analysis represented an erroneous application of strict scrutiny as that term has been defined and employed by the Supreme Court. In *Wygant,* the Supreme Court expressly disapproved of the reasoning employed by the district court in this case. Although the district court had properly analyzed the constitutional validity of Public Act 428 under the law of this circuit as enunciated in *Bratton, Detroit Police Officers' Ass'n,* and *Ohio Contractors Ass'n* when it issued its opinion in this case on August 12, 1983, "an appellate court must apply the law in effect at the time it renders its decision." *Thorpe v. Housing Auth. of City of Durham,* 393 U.S. 268, 281, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969) (footnote omitted). *See also Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 486 n. 16, 101 S.Ct. 2870, 2879 n. 16, 69 L.Ed.2d 784 (1981). Accordingly, in light of the Supreme Court's mandate in *Wygant,* this court must abrogate the legal conclusions of the district court in the case at bar.

■ As indicated by the Supreme Court precedent already discussed, a more appropriate constitutional review of racial or ethnic classifications adopted by governmental bodies should be subjected to a two stage evaluation. First, a court must determine whether a "compelling" state interest supports the use of the racial or ethnic classification. If the court concludes that a compelling interest exists, it must then determine whether the challenged state action employing a racial or ethnic classification is "narrowly tailored" or "necessary" to further that interest.

■ A state "unquestionably has a compelling interest in remedying past and present discrimination by a state actor." *United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 1065, 94 L.Ed.2d 203 (1987) (citations omitted) (plurality opinion). Before a state may permissibly employ a racial or ethnic classification, however, it must make a finding based upon material factual evidence, that it has in the past discriminated against those classes it now favors. If the state had not engaged in discrimination against racial and ethnic minorities in awarding contracts to supply the state with goods and services in the past, then it cannot assert *in praesenti* that it has a compelling interest in preferring MBEs in the award of such contracts.

[The Supreme Court] never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination *by the governmental unit involved* before allowing limited use of racial classifications in order to remedy such discrimination. * * * [P]rior discrimination [is] the justification for, and the limitation on, a State's adoption of race-based remedies.

\*   \*   \*   \*   \*   \*

Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy. * * * No one doubts that there has been serious racial discrimination in this country. But as the legal basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and over expansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.

\*   \*   \*   \*   \*   \*

[A State] must act in accordance with a "core purpose of the Fourteenth Amendment" which is to "do away with all governmentally imposed distinctions based on race." * * * In particular, [a state] must ensure that, before it embarks on an affirmative action program,

it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination.

*Wygant*, 106 S.Ct. at 1847–48 (citations omitted) (some emphasis added). *See also Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757 ("We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals *in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations. After such findings have been made,* the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated.") (citations omitted) (emphasis added); *J. Edinger & Son, Inc. v. City of Louisville*, 802 F.2d 213, 216 (6th Cir.1986) ("[T]he city should be required to present evidence of invidious discrimination."); *South Fla. Chapter of Associated Gen. Contractors of Am. v. Metropolitan Dade County*, 723 F.2d 846, 851–52 (11th Cir.) ("[A]dequate findings [must] have been made to ensure that the governmental body is *remedying* the present effects of past discrimination rather than advancing one racial or ethnic group's interests over another....") (emphasis in original), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed. 2d 150 (1984); *Associated Gen. Contractors of Cal.,* 813 F.2d at 930 ("[S]tate and local governments [can] act only to correct their own past wrongdoing....."). More recently, the Fourth Circuit has stated:

> [B]efore an asserted governmental interest in a racial preference can be accepted as "compelling," there must be findings of prior discrimination. Findings of *societal* discrimination will not suffice; the findings must concern "prior discrimination *by the government unit involved."*
>
> \* \* \* \* \* \*

For a locality to show that it enacted a racial preference as a remedial measure, it must have had a firm basis for believing that such action was required based on prior discrimination by the locality itself.

\* \* \* \* \* \*

*Wygant* ... limit[s] racial preferences to what is necessary to redress a practice of past wrongdoing.

*J.A. Croson Co. v. City of Richmond*, 822 F.2d 1355, 1358, 1360, 1362 (4th Cir.1987) (citations omitted) (emphasis in original). Accordingly, in the instant case, this court must determine whether the State of Michigan possessed a compelling interest in purging the present effects of alleged past discrimination by virtue of *its* past inequitable treatment of MBEs. To accomplish this result, this court must decide whether the Michigan legislature, based upon the evidentiary factual record before it, "had a firm basis for believing that such action was required based on prior discrimination" by the state itself. *J.A. Croson Co.,* 822 F.2d at 1360.[6]

An examination of the evidence assertedly relied upon by the defendants in this action as support for their contention that the Michigan legislature had a firm basis for concluding that the state had engaged in discrimination in awarding contracts for goods and services clearly indicates that Michigan had not developed material evidence to support a conclusion that it had a compelling interest in adopting the racial and ethnic distinctions at issue in the case at bar. The defendants have relied upon certain conclusory historical resumes of unrelated legislative enactments and proposed enactments, executive reports, and a state funded private study conducted in 1974. This documentation is not reflective of discriminatory action by the State of Michigan.[7]

---

**6.** Because the factual record in this case is complete and this court's only function is to determine whether the evidence presented to the district court satisfied a legal standard, remand is unnecessary. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984).

**7.** The defendants in this action have, as a defense, "admitted" that the State of Michigan had engaged in impermissible discrimination in the award of state contracts. *See generally Appellee's Brief,* pp. 29–32. This "admission" is of little relevance and does not relieve this court of its duty to determine whether remedial legisla-

The defendants have directed this court's attention to "executive memoranda"[8] concerning proposed legislation considered by the Michigan legislature during 1971 and subsequent years. The first of these memoranda concern House Bill (H.B.) 4394 (1971) which would have relaxed bonding requirements for state construction contracts. The memoranda conjectured a belief that the state's stringent bonding requirements prohibited most small businesses from effectively competing for such contracts. The proposed statute would have assertedly served the dual purpose of fostering the growth of small businesses in general and benefiting the state by increasing competition for state construction contracts. Fostering the growth of MBEs in particular was not a concern or purpose expressed in the legislative history of H.B. 4394.

Senate Bill (S.B.) 885 (1975) would have set aside a percentage of state goods and services procurement contracts for small businesses. The asserted purpose of this proposed legislation was to foster the growth of small businesses in light of Michigan's "sluggish economy." Again, fostering the growth of MBEs was not a consideration for this proposed legislation.

S.B. 1461 (1976) and S.B. 10 (1977)[9] would have also set aside an allotment of state contracts for small businesses. The executive memoranda commenting upon these enactments suggested that increasing the number of contracts awarded to small businesses would also increase the number of MBEs, which were predominantly small businesses, doing business with the state. In addition, S.B. 1461 included a provision which would have set aside contracts for "socially or economically disadvantaged persons." In testimony given before the Michigan Senate State Affairs Committee in support of S.B. 1461, Norton L. Berman, Director of the Office of Economic Expansion within the Department of Commerce, indicated that underrepresentation of MBEs in state contracting resulted from factors other than discrimination by the State of Michigan:

Small and minority businesses traditionally have experienced problems in management, financing, and market development. These problems oftentimes result from the inability of small businessmen to generate sufficient capital to meet their operational needs.

\* \* \* \* \* \*

Through a series of public hearings and questionnaires sent to small and minority businesses, business persons expressed their concerns in several areas, some of which were: complexity of procurement procedures, information distributed of state agencies was inadequate, contracts were too large, there was no requirement on the part of large contractors to solicit bids from small and minority subcontractors, excessive delay in paying vendors, excessive pre-award costs and bonding requirements which small and minority businessmen could not meet.

\* \* \* \* \* \*

[P]ast business patterns have resulted in under representation of minorities in the business community. Therefore, I feel the state is remiss if we do not do what we can to assure that minority business obtain an equitable share of state purchasing.

I am aware there are those who view this legislation as preferential treatment and the distortion of the competitive spirit of purchasing. I agree that this might be considered so, but unorthodox methods are needed to create opportunities

---

tion in the form of racial and ethnic classifications is, in fact, supported by a compelling interest in alleviating the present effects of past state discrimination. *Wygant,* 106 S.Ct. at 1849 n. 5 ("Nor can the [state] unilaterally insulate itself from this key constitutional question by conceding that it has discriminated in the past, now that it is in its interest to make such a concession.")

**8.** The "executive memoranda" which analyzed pending legislation were prepared for the Governor by each of the state's various executive departments.

**9.** S.B. 1461 and S.B. 10 were essentially identical and were introduced in successive sessions of the Michigan legislature. Neither proposal was enacted into law.

for a major segment of our society that can contribute more to economic stability. With regards to competition, what we have now in many industries is competition among the small operators and domination by a few large firms. Large businesses often can sell at a considerable lower price because of high volume of sales, more efficient distribution systems and more advertising and promotion. Small business cannot equitably compete because of these disadvantages of size.

As reflected in Berman's testimony, the relative lack of MBEs doing business with the state was coupled with the objective reality that most MBEs were small businesses. Small businesses, *as a result of their size*, were unable to effectively compete for state contracts. Consequently, most MBEs, *as a result of their size*, were unable to effectively compete for state contracts.

The legislative history of Public Act 428 itself offered no support for the contention that the State of Michigan intentionally discriminated against MBEs. A House Legislative Analysis of the bill attributed the scarcity of MBE contracts with the state to the lack of minorities within the business community *as a result of societal discrimination:*

> Statistical descriptions of the extent of participation in state programs by businesses controlled by women and minorities are varied and sometimes contradictory depending on the definitions used and the samples of state spending examined. These descriptions, however, all reveal that such businesses receive a disproportionately small share of state spending for construction and goods and services in relation to their proportion of the state's population. That minorities and women have been systematically denied equal opportunity in this country is sad historical fact now generally accepted and widely recognized in legislation of the past two decades. In the interests of justice as well as the social and economic health of the state, the legislature should do all that it can to ensure that businesses owned by minorities and women ob-

tain their fair share of the state's business.

\* \* \* \* \* \*

The federal government and other state governments are already proceeding in this direction as a remedy to the underrepresentation of minority and other segments of business in the business community. The legal issues are difficult and outcomes of various litigations impossible to predict. In the meantime Michigan should continue to be a participant in the enactment of progressive legislation, which would in any case enhance the growth of these underrepresented sectors of the business community, at least until the question of constitutionality is resolved.

Evidence of societal discrimination, however, is an insufficient basis for the employment of racial and ethnic distinctions by state or local governments. *Wygant,* 106 S.Ct. at 1848; *J. Edinger & Son, Inc.,* 802 F.2d at 216–17.

The evidence consisting of executive action designed to increase small business and MBE participation was also insufficient to support a conclusion that the state had discriminated against MBEs. In 1975, the Governor issued Executive Directive 1975–4 creating a task force to study small business participation in state purchasing. After conducting two public hearings wherein witnesses testified that small and minority businesses' size and lack of expertise prohibited them from effectively competing for state purchasing contracts, the task force issued its report recommending the adoption of policies and procedures to aid small and minority businesses in the state procurement process.

In response to the task force's report, the Governor issued Executive Directive 1976–4 wherein he established the Small and Minority Business Procurement Council (Council) to oversee the declared "policy of tye [sic] executive branch agencies of the State of Michigan ... to aid, counsel, assist and protect the interests of small and minority business concerns in order to preserve free competitive enterprise and to

insure that a fair portion of the procurement of state agencies and agencies of the state be placed with small and minority business enterprises." In 1977, the Council issued its first annual report in which it noted that the objectives establishing small and minority business participation in state purchasing had been achieved.

In 1975, the Governor also issued Executive Directive 1975–6 wherein he commanded the Michigan Department of Civil Rights (MDCR) to assist the other state departments in developing and implementing standards and procedures to assure nondiscrimination in awarding state contracts. In 1978, the MDCR issued a report in which it expressed concern over limited compliance with Executive Directive 1975–6 because of the lack of adequate staff in some agencies and the inexperience of personnel in dealing with civil rights matters. The MDCR did not suggest that limited compliance with Executive Directive 1975–6 was the result of intentional discrimination.

The evidence most heavily relied upon by the defendants in this action was the report of a 1974 state-commissioned study by Urban Markets Unlimited, Inc. (Urban Markets). The report, entitled "A Public Procurement Inventory on Minority Vendors," was prefaced with the rather dubious statement: "Minority-owned business enterprises are often described as being synonymous with small business." [10] The report noted that there were 8,112 minority businesses in Michigan, but that in a small sampling of purchase contracts, only four did business with the state.[11] The contracts sampled, however, represented only

approximately $21 million of state's annual expenditures of over $437 million. The sampling was necessarily small and of little value because, as the report noted, the state did not maintain data on minority procurement by state agencies.[12]

Because the statistical evidence was not probative of discrimination, Urban Markets also circulated questionnaires to and conducted interviews of state officials responsible for purchasing goods and services for various state agencies and departments. Responses to Urban Markets' inquiries disclosed that most state agencies did not actively seek new sources of supplies, but instead relied primarily upon "already established purchasing contracts" when filling new orders for goods and services. In particular, the study indicated that only three state agencies were using minority business directories to "actively seek-out" minority suppliers, and that some purchasing officials expressed unfavorable impressions of the quality and reliability of performance afforded by small and minority businesses. Significantly, Urban Markets did not conclude that state purchasing policies were discriminatory, but rather "[m]ost agencies indicated that awards [were] based upon the lowest satisfactory bid."

Most damaging to the defendants' contention that the Michigan legislature was motivated by a compelling interest to eradicate the effects of past state discrimination when it enacted Public Act 428 were defendants' responses to plaintiffs' interrogatories in this action. Plaintiffs requested the defendants to identify the findings of

**10.** The report offers no evidence for this proposition. While it may well be true that most MBEs are small businesses, the notion that the terms are synonymous is not persuasive. There are, no doubt, a substantial number of non-minority small businesses, which, because of their size, also experience problems in effectively competing for state contracts. This questionable proposition, upon which much of the report's analysis is based, seriously undermines the validity of the conclusions reached by Urban Markets.

**11.** As an indication that most MBEs were small businesses, Urban Markets reported that only 2,577 of Michigan's 8,112 MBEs had paid em-

ployees, and all 8,112 businesses employed a total of only 10,958 persons.

**12.** Only 4 of 26 state agencies maintained data on purchases from MBEs. Indeed, one of the report's recommendations was that the state "establish a means of collecting data on the quantity, types, and dollar amounts of purchases which the State expends with minority vendors." The fact that the state admittedly kept no data on MBE participation in state contracts seriously undermined the defendants' attempt to rely on the "statistical evidence" incorporated into the Urban Markets report as an indication of past state discrimination.

past discrimination against each of the minority groups favored in Public Act 428, and defendants responded to each interrogatory as follows:

(1) Upon information and belief, the Michigan Legislature found that

(a) there had been a history of significant political, economic, and cultural discrimination based upon race, ethnic origin, and sex in the United States, including Michigan; and

(b) among the racial and ethnic minorities who have been the victims of such discrimination are Eskimos, Hispanics, Orientals, Indians (Native Americans), Blacks; and

(c) Females have been the victims of discrimination based upon sex; and

(d) as a result of the discrimination described in 1(a) above, racial and ethnic minorities and females have been subjected to economic disadvantages; and

(e) among the consequences of the discrimination described in 1(a) and (d) above, has been an inability to compete on an equal competitive level for access to contracting opportunities with government, including but not limited to such opportunities with the State of Michigan; and

(f) as a result of competitive limitations imposed on racial and ethnic minorities and females because of the discrimination aforesaid, other persons not in those categories enjoy an artificial and unfair advantage in the competitive process; and

(g) the advantages resulting to persons not subject to discrimination based upon racial or ethnic considerations or those of gender reduce competition for state contracts and thereby result in greater costs to the taxpayers for goods and services needed by the State of Michigan; and

(h) establishment of goals and timetables effecting state procurement policies was the most effective feasible means available to remedy the present effects of the discriminatory history and conditions described in 1(a), (d), and (e) above; and

(i) increases in the number of businesses qualified to compete for state contracts will result in a cost benefit to the taxpayers.

In addition, the plaintiffs directed the defendants to identify documents supporting the legislature's conclusion that the state had discriminated against minorities and women in the award of state contracts. In their answer, the defendants, other than referring to the evidence discussed above, again relied upon *societal* discrimination, referring generally to "the history of the western world for the past 2000 years." Furthermore, the state again acknowledged that it did not maintain records concerning the number of MBEs which bid on state contracts and the number which were awarded state contracts.

After reviewing the record in its entirety as developed before the district court, this court concludes that the Michigan legislature had little, if any, probative evidence before it that would warrant a finding that the State of Michigan had discriminated against MBEs in awarding state contracts for the purchase of goods and services. At best, the evidence suggested that societal discrimination had afforded the obstacle to the development of MBEs in their business relationship with the State of Michigan. Consequently, relatively few MBEs exist,[13] and those that do are generally small in size and have difficulty in competing for state contracts as *a result of their size*. The evidence does not prove that the State of Michigan invidiously discriminated against racial and ethnic minorities in awarding state contracts. Accordingly, this court concludes that the state has not supported its conclusion that it had a compelling interest in establishing the racial and ethnic classifications contained in Public Act 428, and those classifications are, therefore, constitutionally invalid.[14]

---

**13.** Berman testified in support of S.B. 1461 that minorities comprise 13.73% of the general population of Michigan, but MBEs comprised only 5.85% of the businesses within the state.

**14.** There is no proof to support preference for the groups listed in Public Act 428, i.e., persons who are "black, hispanic, oriental, eskimo, or an American Indian." Mich.Comp.Law

With regard to the preference accorded WBEs by Public Act 428, the Supreme Court has employed a less stringent standard of review or level of scrutiny for gender based classifications:

> Our decisions also establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an "exeedingly persuasive justification" for the classification. *Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981); *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979). The burden is met only by showing at least that the classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." *Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980).

*Mississippi Univ. for Women v. Hogan* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (footnote omitted). Although the Supreme Court has never expressly defined these terms, "substantially related to serve an important governmental interest" is regarded as a less stringent judicial standard of review than "narrowly tailored to serve a compelling governmental interest." *Associated Gen. Contractors of Cal.,* 813 F.2d at 939 (describing level of scrutiny for gender based classifications as "mid-level review").

Even under this less stringent standard of review, the WBE preferences in Public Act 428 cannot withstand constitutional attack since evidence of record that the state discriminated against women is non-existent. Defendants' reliance upon general assertions of societal discrimination are insufficient to satisfy their burden absent some indication that the "members of the gender benefited by the classification actually suffer[ed] a disadvantage related to the classification." *Mississippi Univ. for Women,* 458 U.S. at 728, 102 S.Ct. at 3338. Defendants presented no evidence that WBEs suffered a disadvantage in competing for state contracts. Accordingly, Public Act 428's gender-based classifications are also invalid.[15]

For the foregoing reasons, this court concludes that Public Act 428, Mich.Comp. Laws § 450.771 *et seq.,* is unconstitutional. Consequently, the judgment of the district court is REVERSED and the case is REMANDED for entry of judgment in favor of the plaintiffs in accordance with this opinion.

LIVELY, Chief Judge, dissenting.

Because I disagree with both major premises of the majority opinion, I must respectfully dissent.

## I.

The majority reads *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), as if it changed all the previously accepted standards for judging the validity of affirmative action programs of governments and governmental units. That is not a fair appraisal of the purport or effect of *Wygant.*

In *Wygant* itself the Court noted that it is necessary in some cases to take race into account, and emphasized the difference in

---

§ 450.771(e). In the answers to plaintiffs' interrogatories, defendants admitted that they were "unaware" of how many MBEs in each of the above minority groups bid for and were awarded state contracts. A finding of "prior, purposeful discrimination against members of each of these [favored] minority groups" is required before state and local governments are permitted to remedy alleged discrimination by the enactment of laws embodying racial and ethnic distinctions. *Wygant,* 106 S.Ct. at 1852 n. 13. *See also J.A. Croson Co.,* 822 F.2d at 1361; *Associated Gen. Contractors of Cal.,* 813 F.2d at 934.

15. Because this court concludes that Michigan lacked a "compelling" interest to support the racial and ethnic distinctions, and an "important" interest to support the gender based distinctions, embodied in Public Act 428, this court does not address the second prong of the constitutional examination, i.e., whether the means were "narrowly tailored" and "substantially related" to the achievement of its goal of eradicating the present effects of prior discrimination.

consequences flowing from a program such as the one involved in this case and one that requires layoffs, as the plan in *Wygant* did. This emphasis was made by contrasting the minority set-aside program that the Court had approved in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), with the plan under consideration in *Wygant,* which did require layoffs:

We have recognized, however, that in order to remedy the effects of prior discrimination, it may be necessary to take race into account. As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy. "When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible." *Id.* [*Fullilove,* 448 U.S.] at 484, 100 S.Ct. at 2778, quoting *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). In *Fullilove,* the challenged statute required at least 10 percent of federal public works funds to be used in contracts with minority-owned business enterprises. This requirement was found to be within the remedial powers of Congress in part because the "actual burden shouldered by nonminority firms is relatively light." 448 U.S. at 484, 100 S.Ct. at 2778.

Significantly, none of the cases discussed above involved layoffs. Here, by contrast, the means chosen to achieve the Board's asserted purposes is that of laying off nonminority teachers with greater seniority in order to retain minority teachers with less seniority. We have previously expressed concern over the burden that a preferential layoffs scheme imposes on innocent parties. See *Firefighters v. Stotts,* 467 U.S. 561, 574–576, 578–579, 104 S.Ct. 2576 [2585–2586, 2587–2588], 81 L.Ed.2d 483 (1984); see also [*Steelworkers v.*] *Weber,* n. 9, *supra* this page, 443 U.S. [193] at 208, 99 S.Ct. [2721] at 2730 [61 L.Ed.2d 480 (1979)] ("The plan does not require the discharge of white workers and their replacement

with new black hirees"). In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

106 S.Ct. at 1850–51 (footnotes omitted).

The Michigan program is similar to the federal MBE program in *Fullilove.* At most, nonminority owned businesses will be required to share the state's contracts with minority owned businesses; no white owned business will be removed from a previously awarded contract. I believe this case is controlled by *Fullilove* and *Ohio Contractors Ass'n v. Keip,* 713 F.2d 167 (6th Cir.1983), rather than by *Wygant.*

The Supreme Court has been unable to agree on the precise level of scrutiny required when considering race conscious programs to assist minorities. While there is a consensus that race conscious programs demand an elevated level of scrutiny, the Court has not defined that level. This is clear from an examination of the plurality opinions from *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), to *United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). In fact a plurality of the Court in *Paradise,* a case subsequent to *Wygant,* noted it has "yet to reach consensus on the appropriate constitutional analysis." *Id.* 107 S.Ct. at 1064.

Despite this uncertainty, at least two prerequisites for a constitutionally acceptable race conscious program are clearly established. The program must be in response to a compelling state goal and it must be narrowly tailored to achieve that goal. The majority concedes, as it must, that the State of Michigan has a compelling interest in eliminating race and gender discrimination from its procedures for awarding public contracts. I believe the Michigan program also satisfies the second requirement in that it is narrowly tailored. Given the

subject matter involved—public contracting—it is hard to conceive of a different approach that would achieve the state's legitimate goals in a less intrusive way. In my opinion the plan chosen by Michigan to correct a system that virtually excluded minority contractors in the past "fits" the situation better than any alternative means. See *Wygant*, 106 S.Ct. at 1850 n. 6, where the Court discusses the meaning of "narrowly tailored," and quotes Professor Ely's definition: "the classification at issue must 'fit' with greater precision than any alternative means."

## II.

I also disagree with the majority's conclusion that the State of Michigan did not develop material evidence that established the existence of past discrimination or the need for a program to increase minority participation. An examination of the record totally refutes this conclusion. The district court found that the Michigan legislature considered the following evidence before finally adopting P.A. 428 in 1981:

1. An Executive Memorandum concerning House Bill No. 4394 (1971). The bill was to help small businesses receive government contracts; MBEs considered to fall within the classification of a small business. Bill and Memorandum indicate early concern for plight of minorities. 571 F.Supp. 178–79.

2. A study commissioned by the state in 1974 to explore the state's procurement policies and its effects upon minorities (the Urban Markets Unlimited Study). Report issued in 1974 examined the procurement opportunities that were available to minority businesses, concluding that opportunities were not great, and that purchasing agents expressed negative attitudes toward minority vendors. *Id.* at 179–81.

3. Three Senate bills introduced in 1975–77 (Senate Bills 885 (1975), 1461 (1976), and 10 (1977)). These bills addressed set-asides for small businesses, but were also designed to address the problems facing minority businesses. *Id.* at 181.

4. Testimony of Norton L. Berman, Director of Office of Economic Expansion, Michigan Department of Commerce, concerning Senate Bill 1461 and encouraging legislature to enact set-asides. *Id.* at 181–82.

5. The Governor's Executive Directive 1975–4 (1975), creating a Task Force on Small Business Participation in State Purchasing. Directive emphasized minority businesses and the difficulty they have had getting into the mainstream of business. *Id.* at 182.

6. Two public hearings of the Task Force, where views were expressed concerning the difficulties of minority businesses. *Id.* at 183.

7. The Task Force's Final Report (March 1976), recommending, inter alia, that goals be established for the participation of MBEs in state procurement. *Id.* at 183.

8. The Governor's Executive Directive 1976–4 (1976), stating that it is the executive branch's policy to ensure that MBEs get a fair portion of business with the state and creating the Small and Minority Business Procurement Council. *Id.* at 183.

9. The First Annual Report of the Council (1977), noting that the commitment for MBEs was reached in the first year. *Id.* at 183–84.

10. The Governor's Executive Directive 1975–6 (1975), directing the Michigan Department of Civil Rights to, inter alia, establish standards to assure nondiscrimination in state contracting. *Id.* at 184.

11. The May 15, 1978 Report of the Department of Civil Rights, expressing concern over limited progress that had been made under Directive 1975–6. *Id.* at 184.

12. Proposed House Bill 4335, initiated March 15, 1979, which provided for MBE set-asides, and later, WBE set-asides. *Id.* at 184–85.

House Bill 4335 was adopted by the legislature two years after it was introduced, and became P.A. 428, the Act at issue in this case. The district court concluded that

this evidence was sufficient for "the Legislature to make a finding of past intentional discrimination." *Id.* at 187. This is a finding of fact that is fully supported by the record and is not clearly erroneous.

The majority's conclusion that the evidence in this case at best suggested "that societal discrimination had afforded the obstacle to the development of MBEs in their business relationship with the State of Michigan" has no support in the record. The Supreme Court has determined that societal discrimination in and of itself is not sufficient justification for enactment of an affirmative action plan. *Wygant*, 106 S.Ct. at 1847. As the Court noted in *Bakke*, it has never "approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations." 438 U.S. at 307, 98 S.Ct. at 2757. Societal discrimination is best exemplified in *Wygant*. The school board extended preferential protection against layoffs to minority employees in order to provide minority students with minority role models. In holding this was an insufficient justification, the Court noted there must be some showing of prior discrimination by the governmental unit and that the plan must have a remedial purpose.

The legislative record in this case clearly shows that the plan enacted by the State of Michigan was not designed solely to aid persons perceived as members of "relatively victimized groups" or to create "role models" for minorities. As noted, the Michigan Legislature began in 1971 to review the problem of limited participation of minority and woman owned businesses in the state's procurement of goods and services. The plan that was adopted approximately nine years later was the culmination of numerous studies, hearings and proposals to rectify the situation. Any acceptable understanding of the concept of federalism requires us to accord the same degree of deference to the findings of a state legislature following years of study and investigation that we give to findings of Congress. The majority's rejection of the legislative showing of prior discrimination is improper, not only because it fails to give the deference that a federal court should give to a state legislature's findings, but because the level of findings which the majority would exact from the legislature has not heretofore been required.

The Supreme Court noted in *Fullilove* that "Congress, of course, may legislate without compiling the kind of 'record' appropriate with respect to judicial or administrative proceedings." 448 U.S. at 478, 100 S.Ct. at 2774. The Court determined that "Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior discrimination." *Id.* at 477–78, 100 S.Ct. at 2774. There is sufficient evidence in the legislative record of Michigan Public Act 428 to support a determination that the state's procurement practices did perpetuate the effects of prior discrimination, resulting in an extremely small percentage of contracts being awarded to minority and woman owned businesses.

As we stated in *Ohio Contractors Ass'n v. Keip*, 713 F.2d at 173:

> The state has chosen to remedy the effects of *its own* past discriminatory practices by means of a program which imposes relatively light burdens on the majority group which was in position to benefit from those practices.

(Emphasis in original). Michigan did the same thing for the same reasons.

Finally, in my opinion the majority places entirely too much emphasis on semantics. The district court's use of "significant" as opposed to "compelling" in describing the state's interest is immaterial, given that the state clearly did have a compelling interest in eliminating discriminatory practices from its contracting and procurement procedures. Although the district court referred to a "reasonableness" test in reviewing the means chosen by Michigan to deal with the state's interest, in actually testing the MBE program the district judge ex-

pressly analyzed all of the factors that the plurality of the Supreme Court analyzed in applying the "narrowly tailored" standard in *Fullilove.* 571 F.Supp. at 188.

I would affirm the judgment of the district court.