Dennis LONG, James Maher, Gary Theunick and Robert Davey, Plaintiffs,

v.

CITY OF SAGINAW, a municipal corporation, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Teamsters Local 129, Defendants.

Civ. A. No. 83–7265–BC.

United States District Court, E.D. Michigan, S.D.

Dec. 1, 1988.

Michael Forster, Saginaw, Mich., for plaintiffs.

Otto W. Brandt, Jr., Saginaw, Mich., Alan S. Brostoff, Timothy G. Dugan, Milwaukee, Wis., for defendant City of Saginaw.

Kenneth M. Gonko, Bloomfield Hills, Mich., for Union.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

This matter is before the Court for reconsideration in light of the Supreme Court's decision in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Previously, the Court entered summary judgment in favor of the defendants, finding the affirmative action plan at issue constitutional under the Sixth Circuit's equal protection analysis in *Wygant*. Upon reviewing the Supreme Court's opinion in *Wygant*, and reconsidering the facts of this case pursuant to that opinion, the Court

sustains its earlier decision and grants the defendants' motion for summary judgment.

## I.

In December of 1982, the defendant City of Saginaw (the City) instituted an affirmative action plan (the plan), in connection with a collective bargaining agreement with the union representing the City's police officers. The terms of the plan provided that a list of minority applicants would be created, and that for each laid-off police officer recalled to work, an applicant from the list would be newly hired. The plan's objective was to increase minority representation on the Saginaw Police Department.

The plaintiffs are former police officers for the City, all of whom were laid off prior to the adoption of the plan. The plaintiffs brought this action alleging, among other things, a denial of their fourteenth amendment rights to the equal protection of the laws. As the plaintiffs are white males, this is essentially a reverse discrimination suit.

On cross-motions for summary judgment, this Court found that the plan was constitutional under the Sixth Circuit's analysis in *Wygant*. There, the court held that the defendant's interest in promoting racial harmony, eliminating historic discrimination, and providing role models for minority students represented reasonable justification for the defendant's layoff policies.[1] The Supreme Court granted certiorari, and reversed the Sixth Circuit. The Court now reconsiders its earlier ruling.

## II.

■ While the Supreme Court failed to produce a majority opinion in *Wygant*,[2] sufficient agreement exists among the Justices to extrapolate some basic principles. The initial inquiry in reverse discrimination cases centers on the governmental interest in creating an affirmative action plan. *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. At the very least, the "public actor [must have] a firm basis for believing that remedial action is required." *Id.* at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring in part). The plurality would require that a public employer, prior to adopting an affirmative action plan, have "convincing evidence that remedial action is warranted." *Id.* at 277, 106 S.Ct. at 1848. Clearly, then, the focus must concern prior discriminatory practices involving the employer adopting the plan. The general societal discrimination cited by the *Wygant* school board in support of its affirmative action plan failed this requirement. Subsequent court decisions reflect the importance of this specific finding, as several circuits have invalidated plans in part due to employers' inability to concretely demonstrate past discrimination. *See Michigan Road Builders Assn., Inc. v. Milliken*, 834 F.2d 583 (6th Cir.1987) *reh. denied en banc; J.A. Croson Co. v. City of Richmond*, 822 F.2d 1355 (4th Cir.1987), *jur. noted* —— U.S. ——, 108 S.Ct. 1010, 98 L.Ed.2d 976 (1988); *Janowiak v. Corp. City of South Bend*, 836 F.2d 1034 (7th Cir.1987). In *Milliken*, for example, the court found that the state, in enacting legislation designed to benefit Minority Business Enterprises (MBEs), "had not developed material evidence to support a conclusion that it had a compelling interest in adopting the racial and ethnic distinctions at issue in the case at bar." *Milliken*, 834 F.2d at 590. The evidence relied on included "conclusory historical resumes of unrelated legislative enactments and proposed enactments, executive reports, and a state funded private study in 1974." *Id.* Close analysis of this evidence resulted in the conclusion that the basis for the proposed legislation was concern for the inability of small businesses to compete because of

---

1. The affirmative action plan in *Wygant* prohibited layoffs to the extent that they would decrease the minority faculty representation below a set percentage of the entire faculty. Thus, at some point senior nonminority faculty members would be laid off prior to less senior minority faculty members.

2. Powell, J., announced the judgment of the Court, in an opinion joined by Burger, Ch.J., and Rehnquist, J.; O'Connor, J., concurred in part and concurred in the judgment; White, J., concurred in the judgment; Marshall, J., joined by Brennan and Blackmun, JJ., dissented; and Stevens, J., dissented.

their size, as well as concern for societal discrimination against MBEs. *Id.* at 592. Neither of these grounds was held sufficient to indicate the type of state interest in eradicating specific prior discrimination necessary to support affirmative action legislation.[3] *Id.* at 594.

In *Croson,* even less evidence existed establishing prior discrimination by the relevant governmental entity. The *Croson* plan required city construction contractors, absent a waiver, to subcontract at least thirty percent of the dollar value of the contract to minority business enterprises. Applying the "compelling governmental interest" standard of the *Wygant* plurality, the court held that the "conclusory and highly general statements made by a member of the public, a City Council member who supported the plan, and the City Manager" failed to furnish the required showing of past discrimination. *Croson,* 822 F.2d at 1358. Furthermore, any comparison of the minority percentage of the overall population to the percentage of minority-owned firms receiving city contracts represented, under *Wygant,* "exactly the kind of evidence that will not pass muster." *Id.* at 1358, 1359. Thus, the court could not uphold the plan based upon "the spurious statistical comparison and the nearly weightless testimony" comprising the totality of the evidence proffered to demonstrate the defendant's justification for adopting its plan. *Id.* at 1359.

In *Higgins v. City of Vallejo,* 823 F.2d 351 (9th Cir.1987), however, the court sustained the constitutionality of an affirmative action plan instituted subsequent to a state agency's finding of past discrimination. The *Vallejo* plan required that applicants for promotion first become certified through an examination procedure. Thereafter, should the group of certified applicants contain an underrepresented minority, the City was empowered to use that factor in rendering its ultimate decision. Applying the *Wygant* plurality's strict standard, the court found that the California Fair Employment Practice Commissions' determination that the City employed "personnel practices that facilitate discrimination" supplied the requisite compelling governmental interest for adopting the plan. *Higgins,* 823 F.2d at 356, 358. Apparently in drawing this conclusion, the court relied on the past hiring and promotional patterns in the police and fire departments, patterns that failed to evidence neutrality in decision making. Additionally, the court noted that the City in fact adopted the plan in response to the unfavorable FEPC report. *Id.* at 356.

■ With respect to the case at hand, the defendants have produced what appears to be substantial evidence demonstrating past discrimination in hiring by the Saginaw Police Department. Although none of the evidence offered involves an agency or judicial determination of prior discrimination by the Saginaw Police Department, proofs are available suggesting that such determinations were circumvented through settlement procedures. In fact, much of the impetus behind the adoption of the current plan arose from 1978 allegations made by the Black Police Officers Association concerning discrimination in assignments and decision-making authority, and also retaliation for filing complaints with the department. A formal complaint filed with the Michigan Department of Civil Rights, regarding discrimination in assignment to off-duty functions, resulted in a settlement.

Additional factors indicating past discrimination include wide disparities in examination performance between whites and minorities, and statistical analyses establishing that in 1980, when 11% of the police department employees were minority, minorities accounted for 29% of the available labor pool for protective services. This statistical evidence is exactly the type found relevant in *Wygant,* as it compares the proper populations for purposes of inferring discrimination leading to minority underrepresentation. Likewise, the exam

---

**3.** Additionally, the court noted that the defendant's answers to certain interrogatories established that societal discrimination alone provided the foundation for the legislation at issue. *Milliken,* 834 F.2d at 594.

score disparities provide competent circumstantial evidence that the testing procedures may have perpetuated discrimination through biased evaluative methods.

The preceding illustrates that the defendants have certainly surpassed the "weightless testimony" and "conclusory historical resumes" found wanting in *Croson* and *Milliken, supra.* The Court, on this basis, therefore finds that an adequate "compelling governmental interest" exists for the adoption of the defendants' affirmative action plan.

### III.

■ Even if the defendants' plan survives the first prong of the *Wygant* analysis, the Court must determine whether the plan is sufficiently narrow to pass constitutional scrutiny. Much has been made in recent cases regarding whether affirmative action plans involve layoffs of existing workers, or simply affect decisions to hire or promote. *See, e.g. Wygant, supra* 476 U.S. at 283, 106 S.Ct. at 1851; *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). In *Wygant,* the Supreme Court held that the school board's plan, requiring the layoff of senior nonminority workers, violated the equal protection clause. "While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives." *Wygant,* 476 U.S. at 283, 106 S.Ct. at 1851 (opinion of Powell, J.) (footnote omitted); *see also* 476 U.S. at 295, 106 S.Ct. at 1857. (White, J., concurring in the judgment).

Conversely, in *Paradise,* the Supreme Court upheld a district court injunction requiring one-black-for-one-white promotions within the Alabama State Police Department:

Because the one-for-one requirement is so limited in scope and duration, it only postpones the promotions of qualified whites. Consequently, like a hiring goal, it "impose[s] a diffuse burden, ... foreclosing only one of several opportuni-

ties." ... "Denial of a future employment opportunity is not as intrusive as loss of an existing job," ... and plainly postponement imposes a lesser burden still.

*Paradise,* 480 U.S. at 183, 107 S.Ct. at 1073, 94 L.Ed.2d at 231 (citations omitted). The issue thus presented to this Court is whether the defendants' plan precludes the plaintiffs from exercising a right to an established recall position, and if so whether such preclusion involves a violation of the plaintiffs' constitutional rights.

At the time of their layoff, the plaintiffs' employment rights were embodied in a collective bargaining agreement subject to "Act 78," a Michigan Public Act that is optionally available to municipalities in establishing police and fire department employment policies. Under Act 78, no police officer could be newly hired prior to reinstatement of all laid-off officers. In 1982, and pursuant to *Local 1383 v. City of Warren,* 411 Mich. 642, 311 N.W.2d 702 (1981), the defendants entered into the collective bargaining agreement, without the plaintiffs' consent, containing the contested affirmative action plan. In *Wygant,* the Supreme Court acknowledged that "[w]hen effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, [ ] a 'sharing of the burden' by innocent parties is not impermissible." 476 U.S. at 281, 106 S.Ct. at 1850, (opinion of Powell, J.) quoting *Fullilove v. Klutznick,* 448 U.S. 448, 484, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (1980) (quoting *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976)). The Court, however, qualified this finding by recognizing that:

[o]f course, when a State implements a race-based plan that requires such a sharing of the burden, it cannot justify the discriminatory effect on some individuals because other individuals had approved the plan. Any "waiver" of the right not to be dealt with by the government on the basis of one's race must be made by those affected.

476 U.S. at 281, n. 8, 106 S.Ct. at 1850 n. 8. Since it is clear that none of the plaintiffs

in the present case approved of the rehiring plan, this Court finds that they retain the rights existent under the earlier collective bargaining agreement.

 Having decided that the plaintiffs, as of the time of the adoption of the affirmative action scheme, held seniority rights for employment recall purposes, we must now determine whether implementation of the plan will violate the "narrowly-tailored" requirements of race-based equal protection analysis.[4] The current context is unlike either the layoff or the hiring/promotion scenarios found in earlier affirmative action cases. Upon analysis, this Court is convinced that the resulting delay in resumption of employment incurred by these plaintiffs is dissimilar to the type of burden denounced in *Wygant.* While it is true that the plan impacts seniority rights owned by the plaintiffs, this impact does not approach that absorbed by the laid-off plaintiff in *Wygant.* The unfortunate reality of the current situation is that few of these plaintiffs could have actually expected a recall to their former positions. Moreover, when recalls do commence, the plaintiffs will merely be forestalled, and not foreclosed, from returning to the police department. In this context, the Saginaw plan is comparable to the plans found valid in *Paradise* and *Higgins, supra.* The Court thus finds that the City of Saginaw's affirmative action plan, as applied to the plaintiffs, is sufficiently narrowly tailored so as to achieve its purpose without undue infringement upon the plaintiffs' rights.

### IV.

In sum, upon reconsideration of this Court's earlier decision in light of the Supreme Court's opinion in *Wygant,* we find the defendant City of Saginaw's affirmative action plan is both supported by suffi-

cient evidence of prior discrimination by defendants and narrowly tailored to achieve its desired result. We, therefore, sustain our earlier decision and GRANT the defendants' motion for summary judgment.

IT IS SO ORDERED.

---

**4.** One troubling aspect of reverse discrimination analysis, which this Court has difficulty reconciling, is with respect to gender. It is clear that some form of heightened scrutiny, if not strict scrutiny, is appropriate in reverse race discrimination analysis. Logically, then, this could require a finding in this case that the affirmative action plan is invalid with respect to the blacks included on the minority hiring list, yet valid with respect to the females included on the list. This result seems inconsistent with the bulk of equal protection doctrine, since the reasons for strict scrutiny in straight race discrimination suits is to benefit a group historically shouldering the majority of discriminatory behavior.